[Crim. No. 2644. Fifth Dist. Jan. 31, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
RAY SANCHEZ SEPEDA, SR., et al., Defendants and Appellants.

## COUNSEL

Glen W. Schofield, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Paul V. Bishop and Ramon de la Guardia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARGANO, Acting P. J.**—Appellants Ray Sanchez Sepeda, Sr., and Lanora Sepeda are husband and wife; they were convicted by a jury of selling heroin in violation of section 11352 of the Health and Safety Code. Appellants' applications for probation were denied and they were sentenced to state prison for the term prescribed by law. They have appealed from the judgment.

On May 28, 1975, at approximately 5:30 p.m., Mike Rodriguez, a paid informant working for the Bureau of Narcotics Enforcement, met with Agent Peter Mouriski and other agents of the bureau to prepare for a "buy" of heroin they wanted to make that evening at the residence of Enrique and Louisa Alejandrez in the City of Fresno. During the meeting, Rodriguez removed all of his clothes at Agent Mouriski's request and was given an extensive skin search by the agent; also, the informant's clothes were searched thoroughly. No contraband was found either upon Rodriguez' person or in his clothing. Thereafter, Rodriguez was equipped with a portable transmitting device that was attached to his body. Then, all of the money Rodriguez possessed was taken away from him, and he was given $150 in currency; the serial numbers on the currency given to the informant had been recorded.

A few minutes later, Agent Mouriski and the informant, Mike Rodriguez, got into an unmarked police car and proceeded toward the Alejandrez residence which was located on East El Monte Avenue. The agent drove east along Kings Canyon Road until he reached Sierra Vista Street. At Sierra Vista, Agent Mouriski turned right and stopped the vehicle about one-half block south of Kings Canyon Road, approximately midway between Kings Canyon Road and East El Monte. Rodriguez got out of the automobile and walked south along Sierra Vista. As Rodriguez walked around the corner and then west along East El Monte, he disappeared from Agent Mouriski's view and came into the line of vision of Agent Erwin Wade, who was parked in an unmarked automobile approximately one block east of the intersection of Sierra Vista and East El Monte. Agent Mouriski then turned his car around and drove to a parking lot on the north side of Kings Canyon Road.

At about 6 p.m., Agent Wade saw Rodriguez walk into the front yard of the Alejandrez residence. However, due to his location, Agent Wade was unable to see Rodriguez walk up to the front door of the residence. About a half hour later, the agent saw a white Ford pickup truck drive westerly along East El Monte and park on the south side of the street in front of the Alejandrez residence; a woman got out of the truck on the passenger side and headed toward the residence; on account of his location, Agent Wade was unable to see if anyone got out on the driver's side. Within a few minutes, the agent saw the informant, Rodriguez, approach the street from the front yard of the Alejandrez residence. He watched as Rodriguez walked east along East El Monte Avenue and turned north onto Sierra Vista.

In the meanwhile, Agent Velasquez, who understood Spanish and who was in a vehicle parked in an alleyway nearby, had been monitoring the portable transmitting device Agent Mouriski had attached to the informant's body. He could hear six separate and distinct voices, but due to outside interference, could not discern what was being said; three of the voices sounded like the voices of women, two sounded like the voices of men, and one sounded like a small boy. At one point, Agent Velasquez heard someone say in Spanish, "Does he have twenty?" but was unable to attribute the statement to any particular voice.

After Rodriguez turned north onto Sierra Vista he immediately was observed by Agent Mouriski from the latter's vantage point in the parking lot on the north side of Kings Canyon Road. Agent Mouriski drove his automobile over to where Rodriguez was standing and the

informant got into the vehicle; Rodriguez handed the agent a plastic bag containing 20 balloons of heroin. He also handed Agent Mouriski $50 of the currency that had been given to him earlier that evening. Rodriguez again was searched thoroughly for contraband and money; none was found upon his person or in his clothing.

At about 6:45 p.m., Agent Wade saw the white Ford pickup truck which was parked in front of the Alejandrez residence start up and proceed west along East El Monte. As the pickup drove out of Agent Wade's view, Agent James Pell, who was driving an unmarked vehicle approximately two blocks west, saw the pickup truck turn right at the intersection of East El Monte Avenue and Maple Avenue, and then proceed north along Maple toward Kings Canyon Road. Agent Pell identified appellant Ray Sepeda as the driver of the white pickup truck.

At trial, Rodriguez testified that after he left Agent Mouriski on Sierra Vista, he walked to the residence of Enrique and Louisa Alejandrez, where a small boy answered when he knocked at the front door. Then, at Enrique Alejandrez' invitation, the informant entered the residence and sat down in the living room; at the time, Enrique's wife Louisa and the couple's daughter were in the home. Rodriguez told Enrique Alejandrez that he wanted to purchase $150 worth of heroin. In response, Mr. Alejandrez explained that he would make the necessary arrangement to obtain the contraband; he made a telephone call to a person he referred to as "Chanate." The informant knew that appellant Ray Sepeda sometimes used that name.

Rodriguez testified that about 6:30 p.m. a white Ford pickup truck pulled up and parked in front of the Alejandrez residence. Then, appellant Ray Sepeda got out of the driver's side of the truck while his wife, appellant Lanora Sepeda, exited from the passenger side; they walked into the living room of the Alejandrez residence. Enrique Alejandrez asked appellant Ray Sepeda, "Have you got it?" and the latter replied that he did. When Mr. Alejandrez asked appellant Ray Sepeda "to give it to him," appellant Lanora Sepeda removed from her brassiere a clear plastic bag containing 20 rolled-up balloons; she handed the bag and balloons to her husband. At that point, appellant Ray Sepeda asked Enrique Alejandrez for the money and Enrique said that Rodriguez had it. The informant asked appellant Ray Sepeda how much the heroin would cost, and Mr. Sepeda replied that he would sell the 20 balloons for $5 a balloon. Rodriguez gave appellant Ray Sepeda $100 in

exchange for the balloons, turned around and walked out of the residence.

In their defense appellants did not deny that the informant was at the Alejandrez residence on the evening of May 28, 1975. However, Louisa Alejandrez testified that appellants were her husband's aunt and uncle, that they were already there when Mike Rodriguez made his appearance and that appellants arrived in a brown and yellow pickup truck. Appellants' defense was primarily an attack upon the credibility of the informant. In 1971 Rodriguez was arrested for and convicted of possession of heroin; he was placed on probation because he cooperated with the Bureau of Narcotics Enforcement. In 1975 Rodriguez was arrested and charged with armed robbery; though this charge was dismissed because it was unfounded, the accusation which led to the charge resulted from the informant's involvement in a narcotics transaction. Also, before Rodriguez was retained by Agent Mouriski to work as a paid informant for the Bureau of Narcotics Enforcement, he admitted to Agent Mouriski that prior to his arrest for the alleged armed robbery he was "trafficking" in substantial quantities of heroin in the Fresno area.

In addition, it was disclosed that when Rodriguez was retained by the Bureau of Narcotics Enforcement to serve as a paid informant he agreed to make seven heroin "buys" from certain specific individuals, and that he would be paid approximately $5,000 for his services. It also was agreed that the informant would receive a small part of his compensation while the purchases were taking place, an additional amount after he testified before the grand jury, and the bulk of the compensation after he testified at all trials resulting from grand jury indictments. In fact, on cross-examination Agent Mouriski admitted that if at any of the trials resulting from the grand jury indictments Rodriguez told a story completely different from that previously related by him to the agents, he would not receive any further payments. It also was admitted at the time of appellants' trial that the bureau still owed the informant approximately $3,000.

■ We consider first appellants' suggestion that the informant's arrangement with the Bureau of Narcotics Enforcement was so conducive to perjury that their convictions should not be allowed to stand. Appellants rely upon *People v. Green* (1951) 102 Cal.App.2d 831 [228 P.2d 867] and *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133] for this proposition.

In *Green* the court held that a conviction cannot stand " . . . where it rests chiefly upon testimony of an accomplice, given under a promise of immunity upon the condition that the testimony he is about to give is such as will result in conviction of one jointly charged with the witness." (*People* v. *Green, supra,* 102 Cal.App.2d 831, 834-835.)

In *Medina* the court concluded that the defendants were denied a fair trial since the prosecution's case depended substantially upon the testimony of accomplices who were granted immunity on condition that their testimony would not substantially or materially differ from prior statements made to the police. (*People* v. *Medina, supra,* 41 Cal.App.3d 438, 455.)

At the outset, it should be noted that the police often are called upon to work with narcotic addicts and persons with past histories of unlawful narcotic activity in order to cope with the numerous and almost insurmountable problems caused by illegal traffic in drugs; in this modern society drug traffic is a major contributor to other forms of crime and juvenile delinquency and, at times, extreme measures are needed to curb the illicit activity. We also realize that often the police must pay such persons in order to secure their help in apprehending drug "peddlers" and in getting them to testify. ■ Accordingly, it has been held that there is no per se prohibition against a police agreement to pay an informant for undercover services upon condition that the informant testify at the criminal trial. (*People* v. *Ballejos* (1963) 216 Cal.App.2d 286, 289 [30 Cal.Rptr. 725]; see generally *People* v. *Rusling* (1969) 268 Cal.App.2d 930, 934-935 [74 Cal.Rptr. 418].)

■ However, we cannot condone a police arrangement of the kind involved in this case. Here the informant, who himself was a person of unsavory reputation, had been involved, deeply, in unlawful narcotics activities. Moreover, he was engaged by the Bureau of Narcotics Enforcement to purchase heroin from certain specific individuals. Lastly, he was to receive the bulk of his compensation only if his testimony at *all* of the criminal trials resulting from his undercover activities was consistent with the statements he already had given to the police and to the grand jury. In our judgment such an arrangement places the informant under a strong compulsion to testify in a particular fashion and is conducive to perjury.

■ Nevertheless, we need not reverse the convictions. The corroborating evidence presented by the People in this case is clear and

convincing, and demonstrates that Rodriguez was telling the truth when he testified at appellants' trial. (Cf. *People* v. *Fuller* (1965) 236 Cal.App.2d 889, 895 [46 Cal.Rptr. 435].)

First, before Agent Mouriski drove Rodriguez to the location on Sierra Vista Avenue where the informant got out of the car, the agent thoroughly searched Rodriguez' person and clothes; during the skin search, the informant even was ordered to lift up his arms and to bend over so that both his armpits and posterior could be examined. Then Rodriguez was under constant surveillance by agents of the Bureau of Narcotic Enforcement until he entered the front yard of the Alejandrez residence at about 6 p.m.

Second, Rodriguez testified that after he entered the residence and told Enrique Alejandrez that he wanted to purchase $150 worth of heroin, Mr. Alejandrez said that he would make the necessary arrangements; he immediately telephoned the man called "Chanate," and that name was used by appellant Ray Sepeda. Rodriguez further testified that about 20 minutes later appellant Ray Sepeda and his wife, appellant Lanora Sepeda, arrived at the residence in a white Ford pickup truck. At about 6:30 p.m. Agent Wade observed a white Ford pickup truck drive up and park in front of the Alejandrez residence and he saw a woman get out of the vehicle from the passenger side.

Third, the informant said that he purchased the plastic bag containing the 20 balloons of heroin from appellants for the total sum of $100. He stated that he left the residence immediately after the sale was consummated, met Agent Mouriski and gave him the plastic bag and the 20 balloons. Agent Wade testified that shortly after the woman exited from the white Ford pickup truck he saw the informant come out of the Alejandrez residence; thereafter, the informant was constantly in Agent Wade's view until he turned the corner and started walking north along Sierra Vista. Agent Wade also testified that within a few minutes after the informant disappeared from view, the white Ford pickup truck which was parked in front of the Alejandrez residence was driven away; moments later the same pickup truck was seen a few blocks from the Alejandrez residence by a third agent who identified appellant Ray Sepeda as the driver.

Fourth, Agent Mouriski explained that from his vantage point in tne parking lot he saw Rodriguez as the latter turned the corner at Sierra Vista, and that he immediately drove his car to where the informant was

standing and picked him up; the informant gave Agent Mouriski the 20 balloons which contained the heroin. Rodriguez' person and clothes again were searched and no contraband was found; also, the informant still had $50 of the $150 in marked bills which the agents had given him to consummate the "buy."

Lastly, appellants do not deny that Rodriguez was in the home of their nephew on the evening of May 28, 1975, nor do they deny that they also were there. Neither was any contention made at the trial that the heroin was sold to the informant by Enrique or Louisa Alejandrez. On the contrary, it was implied that the sale was made by someone else. Louisa Alejandrez testified that between early February 1975 and June 1975, a relative by the name of Mingo Sepeda was living in her home. She further testified that on the evening of May 28, 1975, a friend by the name of Mario also was there. However, this testimony was contradicted in substantial part by Agent Velasquez who monitored the conversations that emanated from the transmitting unit the agents had attached to Rodriguez before he went to the Alejandrez residence. Agent Velasquez explained that although he could not discern what was being said, he could hear six separate and distinct voices; three of the voices sounded like the voices of women (presumably, Louisa Alejandrez, her daughter and appellant Lanora Sepeda), two sounded like the voices of men and one sounded like a small boy.

Admittedly, in *People* v. *Green, supra,* 102 Cal.App.2d 831 and *People* v. *Medina, supra,* 41 Cal.App.3d 438, the convictions were not allowed to stand, but those cases are distinguishable. There the witnesses were participants in the crimes for which the defendants stood charged; in *Green* the witness was promised full immunity on condition that his testimony resulted in a conviction; in *Medina* the witnesses were promised full immunity if their testimony proved to be totally consistent with what they earlier had told the officers. Also, in those cases, there was very little corroborating evidence to prove that the witnesses were testifying truthfully; most of the corroborating evidence merely showed that crimes had been committed.

In the instant case, Rodriguez was not a participant in the crime for which appellants were standing trial; he was acting as an undercover agent. Moreover, the agents took every precaution to make certain that the informant would be in no position to manufacture evidence against

an innocent person. In other words, this is not a case where, in order to convict the defendant, the People were relying substantially upon the testimony of an accomplice, which was given under conditions that made the testimony wholly unreliable and which was immune from being corroborated, convincingly, by independent police observations. In this case, the informant was a cog in an overall police operation in which the police authorities took every precaution possible to make certain that the informant's testimony would be amply corroborated by the officers themselves.

In summary, the lesson to be learned from *Green* and *Medina* is that it is repugnant to the spirit of fundamental fairness for a person to be convicted upon the testimony of a witness who has been given almost insurmountable inducements to testify in a particular fashion and where the corroborating circumstances proving that the witness is telling the truth are at best minimal. In those cases, the events giving rise to the criminal charges occurred at a time when the authorities neither were aware that the criminal activity was going on, nor were in a position, as here, to take significant, independent, affirmative steps to corroborate the witness' information by their own personal observations.

Appellants' remaining contention for reversal is that the court erred in refusing to give their proffered instruction on the lesser and included offense of possession of heroin and in refusing to give, *sua sponte,* an instruction on the lesser and included offense of possession of heroin for sale.

There is no merit to this contention. No evidence was presented by either the People or appellants which would have absolved appellants of the greater offense while at the same time laying a foundation for a finding that they were guilty of the lesser one. If the People's evidence is believed, appellants committed the greater offense for which they stood charged. On the other hand, if appellants' evidence is believed, they were guilty of neither the greater offense nor the lesser one. Stated in another manner, appellants were guilty of the lesser offense only because the greater one could not have been committed without also committing the lesser offense. Under these circumstances, an instruction on the lesser offense was not mandatory, even though requested. (*People* v. *Whalen* (1973) 33 Cal.App.3d 710, 718 [109 Cal.Rptr. 282]; *People* v. *Perkins* (1970) 9 Cal.App.3d 1048, 1051 [88 Cal.Rptr. 720]; *People* v. *Allison*

(1966) 245 Cal.App.2d 568, 573-574 [54 Cal.Rptr. 148]; *People* v. *Morrison* (1964) 228 Cal.App.2d 707, 712-713 [39 Cal.Rptr. 874].)

The judgment is affirmed.

Franson, J., and Loring, J.,* concurred.

A petition for a rehearing was denied March 2, 1977, and appellants' petition for a hearing by the Supreme Court was denied March 31, 1977.

---

*Assigned by the Chairman of the Judicial Council.