JOANNE HELEN FRANKLIN, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 9601

April 24, 1978                                                   577 P.2d 860

[Rehearing denied May 17, 1978]

*Jeffrey D. Sobel,* Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* District Attorney, and *L. J. O'Neale,* Deputy District Attorney, Clark County, for Respondent.

---

## OPINION

By the Court, GUNDERSON, J.:

On appeal, appellant Joanne Franklin (formerly Wellman) raises eleven issues, one of which impels us to order a new trial, to-wit:

> Are the due process rights of a defendant on trial offended, when the prosecutor not only plea bargains to obtain inculpatory testimony from a purported accomplice, by allowing him to plead guilty to a reduced charge, but also withholds the fruits of the bargain and continues the threat of full prosecution in order to assure testimony in accord with the prosecutor's vision of truth?

In such circumstances, we think, a defendant is denied due process of law within the meaning of both the Nevada and the federal constitutions.

On September 24, 1972, one Roosevelt Swift murdered William A. Wellman, father of his friend Robert Wellman, in the kitchen of the Wellman family home. Mrs. Wellman, who apparently was watching television in another room during the death struggle, reported the crime to the police. Following arrest, Swift entered plea negotiations. Under threat of a death sentence, Swift ultimately recited a version of event satisfactory to the prosecution, agreeing to testify against Mrs. Wellman. Accordingly, the prosecution agreed Swift would be charged with second-degree murder only, receive credit for jail

time served, and serve his remaining sentence outside Nevada, in a prison near his home. Only following Mrs. Wellman's trial and conviction, some three years later, did the state perform its side of the exchange. This June, after but five years total incarceration, Swift will be eligible for parole.

In Nevada, recognizing the dangers of accomplice testimony, our Legislature has provided: "A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof." NRS 175.291(1). As presented at the original preliminary hearing, the State's case against Mrs. Wellman lacked any independent inculpatory evidence whatever. Thus, in Wellman v. Sheriff, 90 Nev. 174, 521 P.2d 365 (1974), this Court ordered the issuance of a writ of habeas corpus, without prejudice to institution of new proceedings, due to the State's failure to show probable cause to hold Mrs. Wellman for trial.

Subsequently, the State reinstituted charges, resulting in Mrs. Wellman's conviction and her sentence to life in prison without possibility of parole.[1] Therefore, on this second appeal, an enlarged record is before us, consisting not only of testimony elicited from Swift, but also evidence the State subsequently developed in an attempt to corroborate its theory of Mrs. Wellman's guilt.[2]

---

[1]By the time Mrs. Wellman was sentenced on August 17, 1976, it had come to appear that Nevada's mandatory capital punishment provisions for "contract murder" were constitutionally impermissible, and that the facts asserted against her and Swift would constitute first degree murder only, with a maximum punishment of life without possibility of parole. See Woodson v. North Carolina, 428 U.S. 280 (1976).

[2]On oral argument of this appeal, the prosecutor could not explain why the evidence which the State now contends "corroborates" Mrs. Wellman's guilt was not presented during her first prosecution. However, Mrs. Wellman's counsel tendered this view:

"Defense counsel: Well, nobody really, I don't think, detected these [statements] to be against the mother when they were made. Again, this isn't a matter of record, but they interviewed everybody that night, and the court sees glimpses of the interviews of Billy and Melissa Wellman and the defendant, all of which were conducted on the night of the murder, all voluntarily at the police station. Now, those were not considered at the time to be sufficiently inculpatory that anybody was arrested as a result of it. They were not considered to be significant enough to even be introduced at the first preliminary hearing. Later, down the line, after this case had been thrown out as violative of the accomplice corroboration rule, then for the first time in the second preliminary hearing, come in these earlier statements and the statement of the defendant. The prosecution didn't even think it to be of sufficient importance to introduce them at the first preliminary hearing."

1. Plea bargaining to obtain testimony of an accomplice is not necessarily improper. LaPena v. State, 92 Nev. 1, 544 P.2d 1187 (1976). However, it has been held "that a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice is placed, either by the prosecution or the court, under a strong compulsion to tertify in a particular fashion." People v. Medina, 116 Cal.Rptr. 133, 145 (Cal.App. 1974). The accomplice witnesses in *Medina* had been granted immunity expessly conditioned upon the promise that their testimony "not materially or substantially change" from prior tape-recorded statements given to law enforcement officials. *Ibid.* at 141. Under such an arrangement the court found the defendants had been denied "any effective cross-examination" and "deprived of the fundamental right to a fair trial." *Ibid.*[3]

In so holding the Calfornia court recognized the accepted practice to permit an accomplice witness to plea bargain only where he is willing to render a full, fair, and accurate account of the facts out of which the charge arose. *See* People v. Green, 228 P.2d 867 (Cal.App.1951); Harris v. State, 15 Tex.Crim. 629 (1884); Rex v. Robinson, 70 D.L.R. 755, 30 B.C. 369 (1921); *see also* United States v. Ford, 99 U.S. 594 (1878); *cf.* State v. Quinn, 142 S.W.2d 79 (Mo. 1940). However, such testimony becomes "tainted beyond redemption" where the accomplice is placed under compulsion to testify in a particular fashion in order to receive the benefits of his plea bargain. *Green,* cited above, at 872.

We agree with the *Medina* rationale, deciding that its application may not be limited solely to situations where immunity is expressly conditioned on specific testimony. As a matter of logic, if the circumstances of the plea bargain would reasonably cause the alleged accomplice to believe he must testify in a

---

From the record, this court cannot determine why not even a *prima facie* case of corroboration was presented during the initial prosecution, if indeed the prosecutor entered his plea bargain with Swift on the basis of the "corroborative evidence" now tendered. Thus, this case demonstrates the potential for injustice which is inherent in selling an admitted felon leniency, in order to buy testimony against another person whom the Constitution presumes innocent, but who nonetheless has been tried and found guilty in the prosecutor's mind. Obviously, a danger exists that a prosecutor may later seek to vindicate his bargain by re-stucturing as "corroboration" facts which, as originally and more objectively perceived in the context of events, did not seem to have such inculpatory quality.

[3]To allow prosecutors to enter such arrangements would also seem to vest them, in any given case, with power to enter an agreement calling upon an alleged "accomplice" to disregard his or her oath if need be, to avoid execution or to obtain other bargained-for penal consideration.

particular fashion, then a less explicit arrangement also violates the defendant's due process rights.[4]

In Rex v. Robinson, cited above, the British Columbia Court of Appeals stated:

> "It is obvious that if the witness . . . get[s] the impression from the Court that unless he told the same story to the Court as he did to the police, he would be executed, then his testimony was tainted beyond redemption and could not, in a legal sense, be weighed by the jury, because the witness was no longer a free agent and there was no standard by which his veracity could be tested or estimated. This is not merely a matter going to the credibility of the witness, but something fundamentally deeper, *viz.,* that by the action of the Court itself the witness was fettered in his testimony and put in so dire a position that the value of his evidence was not capable of appraisement, the situation being reduced to this, essentially, that while at the outset he was adjured to give his evidence freely and fully, yet later on he was warned that if it was not the same as he had already told the police he would be executed. Such a warning defeated the first object of justice, because what the witness should from first to last have understood was that, at all hazards, he was to tell the truth then in the witness box, however false may have been what he had said before in the police station." *Ibid.* at 761.

The court in *Robinson* merely inferred that the promised pardon depended upon the testimony being "the same as he had already told the police." Looking objectively at the facts of the instant case, we are led to the same conclusion.

The prosecution did not permit Swift to plead guilty until *after* his testimony was given at the preliminary hearing and trial. The prosecution obviously had so little faith in Swift's veracity, and willingness to implicate the defendant, that it felt constrained to use the plea bargain as the "fee" to induce his cooperation. Under these circumstances, it cannot be assumed that Swift's testimony was full, fair and accurate. Obviously, such tactics must be extremely effective to elicit testimony the

---

[4]Obviously, too, no rational distinction may be drawn between the purchase and coercion of testimony as in *Medina,* where full immunity was the price, as contrasted to the instant case, which involved drastic reduction of the legally appropriate charges coupled with the threat of maximum prosecution.

prosecutor desires.[5] However, a "prosecutor's primary duty is not to convict but to see that justice is done." SCR 181(3). In our view, justice is not served where the prosecutor must simultaneously purchase and coerce testimony in order to obtain a conviction which might not be achieved with trustworthy evidence.

We note that "[i]t is unprofessional conduct to compensate a witness . . . for giving testimony." A.B.A. Standards on "The Prosecution Function," Standard 3.2, 81 (1971). *Cf.* People v. Sepeda, 136 Cal.Rptr. 119 (Cal.App. 1977). A lawyer "should avoid any suggestion calculated to induce any witness to suppress evidence or deviate from the truth." SCR 188(1). Under our system of jurisprudence, if a defendant is to be presumed innocent, then any procedure which commits the prosecution to a chosen theory of guilt, necessarily precludes further inquiry into who may actually be guilty. By bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed, the prosecution becomes committed to a theory quite possibly inconsistent with the truth and the rearch for truth. We deem

---

[5]The prosecutor's purpose is not only inferable from his actions, but, in this case, apparently was candidly acknowledged by the prosecutor himself. Defense counsel filed affidavits in support of Mrs. Wellman's motion for new trial, reflecting that (1) Swift believed before testifying at trial that his "deal" depended upon his incriminating Franklin; and (2) the prosecutor admitted he would not let Swift plead and complete his "deal" until after implicating Franklin at trial because he wanted "to keep a hammer over Swift." The prosecution made no attempt to controvert these averments. Indeed, the record shows that when the court heard Mrs. Wellman's motion for new trial, the prosecutor stated there was no need for defense counsel to call his witnesses to the stand, conceding: "I think that basically the affidavits state about what came up during the trial. . . ."

The prosecution has also acknowledged that, had Swift not incriminated Mrs. Wellman, the State would have pursued him for the maximum available penalty, rather than allowing him his agreed "deal." At oral argument, the following colloquy took place:

"Prosecutor: If he testified that he did not commit the murder for another person, if he testified that he committed the murder at his own instance, it would be an entirely different situation.

Court: And you would have pursued him for first degree murder, wouldn't you?

Prosecutor: Because under that situation he would have been culpable for first degree murder.

Court: Well under any circumstance, he would have been guilty of first degree murder, correct?

Prosecutor: That is correct. It was a question of whether we let the greater guilty party escape or whether we find both parties guilty, which is—

Court: Very well. Well, if you would contain yourself, and not give me your moral reasons, but simply give me the answers. You are telling me that you would have pursued him for first degree murder. Correct?

Prosecutor: Had he testified that truthfully that he killed Mr. Wellman on his own instance, yes."

this contrary to public policy, to due process, and to any sense of justice.[6]

2. The error committed by using the alleged accomplice's "tainted" testimony at the former trial, however, should not preclude his testimony on retrial. Swift has now been permitted to plead guilty. Thus, undue compulsion to testify in a particular way has been removed. If the prosecution believes it can win a fair trial, then Swift should now be given an opportunity to testify fully and fairly. To insure this result, we should free the witness of any coercion other than his oath, and obviate any other possible prejudice to the defendant. To this end, we order that Swift's prior testimony, obtained contrary to due process of law, will be inadmissible either for impeachment purposes, for substantive evidence as a prior inconsistent statement, or in any future perjury prosecution. This is the approach taken in California, not to protect the witness, but to see that justice is served. *See Medina,* cited above, at 151.

3. In conclusion, we note that any limitation this decision imposes upon the practice of plea bargaining, in order to assure due process and respect for our court system, is neither oppressive nor confining. It deprives prosecutors of no expedient they should be permitted to employ. After all, if a prosecutor believes an alleged accomplice is telling the truth, then at least three inducements to relate that truth at trial can be expected to remain, even though the accomplice is first permitted to plead guilty. The first of these is the testimonial oath, backed with sanctions for perjury, which is what legally compels candor from other witnesses. The second is the court's contempt power. The third is hope of additional future clemency. If the prosecution deems its prospective witness so totally untrustworthy that these conventional inducements to truth are insufficient, then in our view the gas chamber or lengthy imprisonment should not be brandished as an additional sanction, in

---

[6]Quite aside from due process concerns, in the manual on *Nevada Criminal Justice Standards and Goals* (1977), it is recommended that a court should not accept a negotiated plea of guilty which "would not serve the public interest." *Ibid.,* Standard 3.7(10), at 167. A plea does not "serve the public interest if it: . . . depreciates the seriousness of the defendant's activity or otherwise promotes disrespect for the criminal justice system;" . . . or "would result in a conviction for an offense out of proportion to the seriousness with which the community would evaluate the defendant's conduct upon which the charge it based." *Ibid.* Here, the accomplice was given an extremely lenient sentence on a capital offense, in exchange for his testimony. It therefore may be questioned whether any court should have accepted his negotiated plea in light of the seriousness of his admitted crime. Of course, if the court should have rejected the plea bargain, then the prosecutor had no right to make it in the first instance.

order to achieve a conviction for which there is otherwise no sufficient evidence.

Upon retrial of this cause, other assigned errors may well not reoccur in a comparable factual context, and are therefore not considered.

Reversed and remanded.

BATJER, C. J., and THOMPSON, J., concur.

MANOUKIAN, J., dissenting, with whom MOWBRAY, J., joins:

I am not in accord with the views expressed by the majority and cannot acquiesce in the reversal. The effect of the majority opinion is that should the State decide to institute a third prosecution of appellant, it must hope for the continued cooperation of accomplice Swift within the framework of gratuitous limitations set forth by the majority proscribing the use of his prior testimony and further expend, in my view, unnecessarily, substantial public funds in a protracted trial in an effort to again prove appellant's guilt.

Essentially, appellant charges error premised upon the fact that Swift, the admitted slayer, was permitted to plead to a charge of second-degree murder in exchange for testimony against her and that such plea was permitted only after his testifying. Appellant cites People v. Medina, 116 Cal.Rptr. 133 (Cal.App. 1974), for the proposition that such prosecutorial tactics violate a defendant's right to due process. *Medina,* however, is easily distinguishable from our facts. There the witness was granted *absolute immunity* on the express condition that he testify precisely in accordance with the prior statements given to police. In that context, the district court of appeals justifiably held that "a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under the strong compulsion to testify in a particular fashion." *Id.* at 145.

In the instant case, there was no such express condition compelling specific recitation of testimony. The majority attempt to fabricate compulsion by stating that "[u]nder threat of a death sentence, Swift ultimately recited a version of events. . . ." Such speculation is without support from the record. Appellant equally was under threat of a death sentence but instead received life imprisonment. This Court should not attempt to gauge the length of incarceration the Parole Commission and our correctional authorities might set for Swift. He is potentially imprisoned for life and there exists no basis to contend

that the sentences of Franklin and Swift were so disproportionate as to shock the conscience at such violation of due process. *Compare,* Farmer v. Sheriff, 93 Nev. 535, 569 P.2d 939 (1977).

There is a marked distinction between compulsion to testify as instructed and a reduction of charges conditioned upon a person's testifying fully and honestly pertaining to the facts surrounding the crime. Examination of the cases cited by the majority finds them clearly distinguishable on their facts. Each involved either absolute immunity or ultimate expungment negotiated for promised testimony. *See, e.g.,* People v. Green, 228 P.2d 867 (1951). The existence of the bargain or the expectation of leniency affects the credibility of the testimony not its admissibility. State v. Quinn, 142 S.W.2d 79 (Mo. 1940); *accord,* Darden v. United States, 405 F.2d 1054 (9th Cir. 1969); Diaz-Rosendo v. United States, 357 F.2d 124 (9th Cir. 1966); United States v. Rainone, 192 F.2d 860 (2nd Cir. 1951); People v. Bowley, 382 P.2d 591 (Cal. 1963). "The fact that [Swift] may have hoped for leniency affected only the weight which the jury should accord his testimony." *Diaz-Rosendo, supra,* 357 F.2d at 130.

What occurred here is little different from a trial court deferring the imposition of sentence after accepting a plea pending the defendant's giving the bargained-for testimony. Such court practice has received general judicial approval. *See, e.g.,* United States v. Vida, 370 F.2d 759 (6th Cir. 1966). Here, the full plea bargain was disclosed to the jury, emphasized on cross-examination, argued as an issue of accomplice credibility, and ultimately the subject of jury instuctions.[1] *Cf. Darden, supra; Diaz-Rosendo, supra;* Minkin v. United States, 383 F.2d 427 (9th Cir. 1967); United States v. Marchese, 341 F.2d 782 (9th Cir. 1965).

I remain unimpressed in this factual context that the use of testimony offered by an accomplice unpled and unsentenced deprives a defendant of due process. Neither am I here disposed to establish yet another technicality in criminal procedure hitherto unknown to Nevada criminal jurisprudence,

---

[1]Instruction No. 15 read in part: "In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. If there is not such independent evidence which tends to connect the defendant with the commission of the offense, the testimony of the accomplice is not corroborated."

Instruction No. 16 read in part: "Apart from the issue of corroboration, it is further the law that the testimony of an accomplice ought to be viewed with suspicion and caution. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

particularly so where the sentence of the defendant and the accomplice are not too disparate, the testimony of the accomplice is sufficiently credible and supported by other substantial evidence. This is especially true in view of what I glean from our Legislature's then intent to treat the initiator of a contract in such willful, deliberate, premeditated, and vicious homicides as primarily culpable.

Swift's testimony given as early as the preliminary examination and throughout all proceedings, including the trial, was quite consistent and was a reiteration of his prior video tape statements made to the police and at least one other person prior to his arrest. The statements initially given to the police preceded any offer of concessions by the authorities.[2] This testimony thereby achieved a high degree of credibility.

The two young children of appellant provided corroborative evidence supporting Swift's testimony. Not only did their testimony parallel Swift's version of the facts, but the combined testimony of all three witnesses was markedly sharp in contrast to appellant's discrepant statements. Appellant originally told police that someone had broken into the home, although there was no indication of a forced entry. She stated that she had seen no one nor had she heard any yelling or scuffling in the kitchen where her husband was murdered. Later, in the presence of police officers, she told a neighbor that her husband was stabbed by the black man who had been "hanging around" the house for several days. When questioned by police about her statement, she denied any knowledge of the black man, although Swift's employers testified that he received a number of phone calls after the homicide from an adult female identifying herself as "Mrs. Wellman," appellant's then name.

Her children, however, testified that on the night of the murder a black man came to the home and talked with appellant before going into the kitchen to kill their father. The children

[2]During trial, the following exchange between Deputy District Attorney Koot and witness Swift occurred.

Direct Examination by Mr. Koot:

"Q. And what if in fact were the negotiations entered between you and through Mr. Beatty, your attorney, and the District Attorney's office?

A. . . .

Q. But that was done after you gave the video tape statement; was it not?

A. Yes, sir.

Q. In the video tape statement, did you relate basically what you have related to the jury today?

A. Basically, yes, sir.

Q. Now, at the time you did give that video statement to the police here in Las Vegas, had any promises been made to you?

A. No, sir, no promises."

further testified that they heard sounds of fighting emanating from the kitchen and heard their father calling for help from their mother. They stated that they wanted to go render assistance to their father but that appellant held them on the couch and continued to watch television. The children saw the black man leave through the front door and testified that their mother then called the police. After adamant denial, appellant eventually admitted acquaintance with Swift. Such fabricated and contradictory statements alone may constitute corroborative evidence. People v. Santo, 273 P.2d 249 (Cal. 1954); People v. Simpson, 275 P.2d 31 (Cal. 1954).

Confronted with this substantial evidence, still, my brethren feel that appellant's right to due process was offended. While I agree here with the majority that "a court should not accept a negotiated plea of guilty which would not serve the public interest," it seems in the best interests of the public, however, to convict two guilty coconspirators rather than merely one, possibly none at all. Prosecutorial etiquette, assuring that "justice is done," SCR 181(3), would demand nothing less.

In LaPena v. State, 92 Nev. 1, 6, 544 P.2d 1187, 1190 (1976), this Court held that although the accomplice's "participation in the crimes may have warranted a more serious charge than second-degree murder, plea bargaining is permissible." Thus, grants of immunity are generally permissible "[u]ntil legislatively [or otherwise] forbidden." Id. at 6, 544 P.2d at 1190. See also, Santobello v. New York, 404 U.S. 257 (1971). This is not the case for such prohibition. In the instant case, I observe no compulsion for rehearsed testimony effected by negotiation and consequently find no error. I hasten to caution, however, that if circumstances in future cases are any less cogent than those presently before the Court, I would not hesitate to remand for new trial despite considerations of time, convenience, expense, and unavailability of witnesses or evidence.

I would affirm the judgment of conviction.