STATE of Wisconsin, Plaintiff-Respondent,

v.

John NERISON, Defendant-Appellant.†

Court of Appeals

*No. 85–0951–CR. Submitted on briefs January 24, 1986.—
Decided March 25, 1986.*

(Also reported in 387 N.W.2d 128.)

† Petition to review granted. ABRAHAMSON, J., took no part.

For the defendant-appellant the cause was submitted on the briefs of *Janet A. Jenkins* and *Bosshard & Associates* of La Crosse.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Daniel J. O'Brien,* assistant attorney general.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J. John Nerison appeals from a judgment of conviction for being a party to the crimes of theft and burglary pursuant to secs. 943.20(1)(a) and (3)(a), 943.10(1)(a), and 939.05, Stats.[1] The issue is whether admission of the testimony of two "accomplices" deprived Nerison of a fair trial. We conclude that the accomplices' testimony was so indelibly and irreparably tainted by the state's actions in securing it that its admission violated Nerison's due process rights. We therefore reverse the conviction.

In early April, 1983, Lyle Dank was arrested for stealing cattle belonging to Clifford Chambers. Unable to post bond, he was held in jail. While in jail, he was approached by the sheriff, who, on behalf of the district attorney, offered him a "deal." In exchange for disclosing the identities of any persons who may have been involved in the Chambers theft and other unsolved cattle thefts, Dank would be released on bond, the charges pending against him would be reduced, and the state would recommend probation, rather than a prison sen-

---

[1] The jury verdict, the sentencing transcript and the *notice of* appeal all indicate that Nerison was convicted of two counts of theft and two counts of burglary. The Judgments of conviction, however, recite only two counts of burglary. This confusion is likely the result of administrative error, and our opinion is directed to all counts on which Nerison was convicted and sentenced.

tence. In addition, the district attorney agreed that Dank would not be prosecuted for any crimes he might admit during the interviews and that he would not be sentenced for the Chambers theft until sometime later, when his testimony was no longer necessary to implicate other participants whom he might identify.

Dank agreed to cooperate and was questioned under oath by several officers. He stated that he and Daniel Erickson had stolen several cattle belonging to Roger Mueller and sold them to Nerison, a wholesale cattle dealer. He also implicated Erickson and a third man, Fred Eich, in one or more other cattle thefts. On several occasions, officers specifically asked Dank whether Nerison had been involved in, or had knowledge of, any of the thefts. Dank stated that Nerison was not involved and did not know that he was purchasing stolen cattle.

On the basis of Dank's statements, Erickson and Eich were charged with theft. Dank testified at preliminary hearings in both cases, again stating under oath that Nerison was not involved in any of the thefts. At a third preliminary hearing on another charge against Erickson, Dank again testified that Nerison had no knowledge that the purchased cattle were stolen.

Erickson eventually went to trial. He took the stand in his own defense and testified that he did not participate in any of the thefts. Dank testified for the prosecution, and Erickson was convicted and sentenced to seven years in prison. Eich was also convicted on the basis of Dank's testimony.

During this time, Dank, who had not yet been sentenced for the Chambers theft and was still free on bond, was charged with other crimes—two counts of battery and one of attempted theft. As to the latter,

Dank attempted to steal a bull and sell it under his name at Nerison's sale barn. Nerison recognized the animal as stolen, refused to pay Dank the money received in its sale and called the police. With the new charges pending against him, Dank approached Nerison to ask whether "he could talk to Russell Hanson [the district attorney] and see if he could let up a little bit."[2] Dank threatened to implicate Nerison in the thefts if he could not get the district attorney to stop prosecuting him.

Eventually, Dank was convicted for both the Chambers theft and the later offenses. He received his original "deal" for the Chambers theft, a withheld sentence and probation. On the new charges, battery and attempted theft of the bull, he was sentenced to one year in prison. This did not end matters, however.

After his trial, Erickson was charged with subornation of perjury for allegedly enticing a defense witness to testify falsely. With this charge pending, the police and the district attorney, who were trying to obtain evidence against Nerison, visited Erickson in prison. They paid a similar visit to Dank. As a result of these visits, both Dank and Erickson, for the first time, accused Nerison of participating in the cattle thefts.

A John Doe investigation was convened at which both Erickson and Dank gave testimony implicating Nerison. During the hearings, the prosecutor outlined the "bargains" he had struck with Dank and Erickson in exchange for their testimony against Nerison at the John Doe and at trial. Dank was promised: (1) that he

---

[2] Russell Hanson, the part-time Vernon County District Attorney, was Nerison's personal attorney. Hanson subsequently disqualified himself as district attorney, and a special prosecutor was appointed to continue with Nerison's case.

would be granted immunity for any criminal activities he might testify to; and (2) that he would not be prosecuted for his part in a 1983 cattle theft in Rock county. Erickson received the following inducements: (1) the state's recommendation that his existing sentence be reduced by three years and that he be transferred to a minimum security prison and paroled early; (2) dismissal of the perjury charge; and (3) the state's promise not to prosecute him for his part in the 1983 Rock county theft. According to the prosecutor, if Dank made "material misrepresentations" in his John Doe or trial testimony, the deal would be off. In addition, both Dank and Erickson were granted immunity from prosecution for perjury in connection with their testimony implicating Nerison in the cattle thefts.

As a result of Dank's and Erickson's testimony at the John Doe hearings, Nerison was charged with theft and burglary of the Mueller and Chambers cattle. The theory of the prosecution was that Nerison had agreed with Dank and Erickson in advance to purchase any cattle they might steal. Both men testified at Nerison's trial, and theirs was the only testimony specifically implicating him in the "conspiracy." The terms of the state's agreements with each witness were made known to the jury, and the jury convicted Nerison on all four counts.

Nerison argues that his conviction should be reversed because the state's tactics in negotiating for Dank's and Erickson's testimony so tainted the evidence that he was deprived of a fair trial.

■ The testimony of an accomplice, given in exchange for concessions or inducements by the prosecution, is generally admissible where the "established

safeguards"—full disclosure of the bargain, opportunity for cross-examination and adequate instructions to the jury—are present. *United States v. Dailey,* 759 F.2d 192, 196 (1st Cir. 1985). Any concern over the credibility and reliability of such testimony is said to be satisfied by allowing the jury to evaluate the accomplice's testimony, tested by cross-examination, in light of full disclosure of any plea agreements and careful instructions by the trial court. *Id.* at 198–200.

The state points out that the testimony of Dank and Erickson was admitted with all appropriate safeguards: the terms of the plea agreements were disclosed to the jury, defense counsel "aggressively" cross-examined both witnesses, and the court properly instructed the jury as to accomplice testimony, witness immunity and *falsus in uno.* Nerison argues, however, that this is one of those rare cases where the circumstances surrounding the bargained testimony are so extreme that the evidence should not have been admitted regardless of the trial court's adherence to the traditional safeguards.

A prosecutor may properly offer immunity, lenient treatment, prosecutorial abstinence or favor to a person charged with a crime, conditioned upon the person's full and truthful testimony. It is also acceptable to allow that person's sentence to remain open until after he or she testifies, so long as the bargain contemplates complete and truthful testimony. *United States v. Fallon,* 776 F.2d 727, 733 (7th Cir. 1985); *United States v. Kenney,* 598 F. Supp. 874, 879–80 (D. Me. 1984). This device ensures that the witness will follow through on his or her end of the bargain. The preferred practice in such cases is for the government to make

it clear to the witness that the failure to fully cooperate by means of truthful testimony will vitiate the underlying bargain. *Dailey,* 759 F.2d at 197, 200. We have no problem with such contingent agreements and recognize that "the State may withhold its *quid* until the accomplice produces his or her *quo.*" *State v. DeWitt,* 286 N.W.2d 379, 384 (Ia. 1979), *cert. denied,* 449 U.S. 844 (1980).

At some point, however, a plea bargain conditioned upon an agreement to testify against another may create such an incentive to commit perjury as to deprive a defendant of the constitutionally-guaranteed right to a fair trial. Under certain extreme circumstances, procedural safeguards simply "do not provide the immutable guaranty of the Due Process clause against outrageous deals." *Fallon,* 776 F.2d at 734. Specifically, "where the prosecutor . . . bargains with an accomplice for false or specific testimony or a specific result, the accomplice's subsequent testimony is tainted and inadmissible." *DeWitt,* 286 N.W.2d at 384.

There is a line which, when crossed, corrupts an accomplice's testimonial bargain to such a degree that due process demands exclusion of that testimony regardless of the existence of the "traditional safeguards." That line is crossed when no reasonable person could avoid finding that such a bargain has been struck. *Id.* at 386. *See also Franklin v. State,* 577 P.2d 860, 862–63 (Nev. 1978) (prosecutor withheld the "benefits" of the bargain until after the accomplice's testimony, acknowledging that if the witness did not implicate the defendant, the deal would be off); *People v. Medina,* 116 Cal. Rptr. 133, 143–45 (1974) (immunity

granted on the condition that the witness's testimony did not materially or substantially differ from that given in an earlier recorded statement); *People v. Green,* 228 P.2d 867, 868–72 (Cal. Ct. App. 1951) (charge to be dismissed in exchange for accomplice's testimony at a preliminary hearing, conditioned on the defendant's bindover).[3]

These cases tell us that if the inducements offered by the prosecution place the witness under a strong compulsion to testify in a particular fashion, they may rise to such a level of coercion, or provide such an incentive to perjury, that the defendant against whom that testimony is offered is deprived of due process.

We turn to the specifics of the state's agreements with Dank and Erickson. Dank testified as follows regarding his "bargain."

---

[3] *Medina, Green* and *Franklin,* all adopt the reasoning of the British Columbia Court of Appeal in *Rex v. Robinson,* 30 B.C. 369, 70 D.L.R. 755, 761–62 (1921):

> [I]f the witness did get the impression . . . that unless he told the same story to the Court as he did to the police, he would be executed, then his testimony was tainted beyond redemption and could not, in a legal sense, be weighed by the jury, because the witness was no longer a free agent and there was no standard by which his veracity could be tested or estimated. This is not merely a matter going to the credibility of the witness, but something fundamentally deeper, *viz.,* that . . . the witness was fettered in his testimony and put in so dire a position that the value of his evidence was not capable of appraisement, the situation being reduced to this, essentially, that while at the outset he was adjured to give his evidence freely and fully, yet later on he was warned that if it was not the same as he had already told the police he would be executed. Such a warning defeated the first object of justice, because what the witness should from first to last have understood was that, at all hazards, he was to tell the truth then in the witness box. . . .

[Direct examination by the prosecutor:]

Q: . . . what happened . . . to change your mind about implicating Mr. Nerison?

A: Well yourself, the sheriff and . . . the private investigator came down and asked me to cooperate.

. . . .

Q: Up to that point you had steadfastly maintained that John Nerison was not involved in as far as having any advance knowledge about these cattle thefts and that he was just an innocent dupe who bought some stolen cows, correct?

A: Right.

. . . .

Q: And at what point in time [did you change your mind]?

A: When you came down and the sheriff came down and said that you were going to charge me with perjury or some other charges if I didn't cooperate. . . . I believe that it was perjury and for Rock County for a cattle theft.

. . . .

Q: [What was] your thought process at the time?

A: . . . I really didn't know the law and I didn't want to take the chance of jeopardizing another sentence.

[Cross-examination:]

Q: Mr. Dank you wouldn't be here testifying against Mr. Nerison if you had not made a deal?

A: No, I wouldn't.

Q: And if you had failed to testify today as you have what is your understanding of what would happen to you?

A: I would be charged for perjury and I would have been charged again for Rock County. . . . I would have been able to retire . . . in Waupun.

Q: Do you feel that the state has had a club over your head then as you appear today?

A: I believe so.

. . . .

Q: Are you fearful in giving your testimony here today?

A: Well, yes I am.

[Redirect:]

Q: What are you afraid of . . . ?

A: I am afraid that after this is all over I might be charged with something else.

. . . .

[Recross:]

Q: Well the reason that you are fearful of testifying is that you fear that if you don't say it the way the state wants you to say it that they might reopen the charges is that correct?

A: Yes.

Q: And press more charges . . . ?

A: Yes.

Erickson was similarly induced. In exchange for his inculpatory testimony at the John Doe, the prosecu-

tor agreed to recommend cutting his existing sentence by three years, to secure his placement in a less-confining institution, to recommend early parole and to drop the pending perjury charge. In addition, because Erickson's testimony at his own trial and at the John Doe hearing was inconsistent, and, as his attorney noted, "could be classified as perjurous [sic] in one instance or the other," Erickson demanded, and was granted, immunity from perjury before he agreed to repeat his John Doe testimony at Nerison's trial. The prosecutor recommended to the court that Erickson's request be granted, stating:

> It is my belief that the testimony that was given in [Erickson's] trial in Richland County was false and perjured testimony. It is further my belief that the [John Doe] testimony . . . is in fact the truthful rendering . . . and it is my intention to allow Mr. Erickson to escape prosecution for the former perjury . . . provided that he testifies in this case . . . and provided that his testimony is truthful *which . . . I believe to be consistent with his testimony at the John Doe Hearing.* (Emphasis added.)

The prosecutor's remarks indicate to us that he was bargaining not for the truth, but for specific testimony implicating Nerison in the thefts.

Dank had been questioned repeatedly under oath—both in and out of court—pursuant to his agreement to inculpate anyone and everyone known to him to be involved in the thefts. He never mentioned Nerison and, when specifically asked, testified that Nerison had no involvement of any kind in any of the thefts. Erickson, at his own trial, denied any knowledge of the thefts. Both men went to prison without incriminating Nerison. More than a year had elapsed between the

time Dank and Erickson had been arrested on the cattle theft charges and the time the prosecutor approached them in their prison cells with his "offer." During all that time, neither Dank nor Erickson had ever approached the state saying he wished to come forward to tell the "truth." Yet, later, after the prosecutor's visit, both incriminated Nerison without hesitation.

The state argues that it only asked for the "truth"—a proper bargain. But it asked for more than truth, more than cooperation, from Dank and Erickson. It asked that its particular version of the "truth" be told: the prosecutor was interested only in testimony that would tie Nerison to the thefts, and he drove an impermissible bargain to obtain it. If Dank and Erickson supplied specific incriminating testimony, charges would be dropped, sentences halved and acknowledged crimes forgiven. If they did not, the existing charges would stick, and new ones would be filed.

Dank could reap the benefit of his bargain only if he did not make any "material misrepresentation" in his testimony. By "misrepresentation," the prosecutor could only mean testimony which would exculpate Nerison, since he previously had warned Dank that he considered such testimony to be perjury and was prepared to charge him for it. The same holds true for Erickson. The prosecutor agreed that Erickson could escape prosecution for perjury provided that his testimony was "consistent with his testimony at the John Doe Hearing"—testimony which, for the first time, incriminated Nerison. The prosecution, not the witnesses, defined the truth in its own terms—Nerison's involvement in the thefts—and if that "truth" was not

forthcoming, all deals were off. Where a witness, directly or indirectly, is led to believe that the "truth" sought by the prosecutor is particularized or specific testimony, and he faces prosecution "if he [doesn't] tell the 'truth,' " such tactics are "universally condemn[ed]" as bordering on intimidation. *State v. Ivy,* 300 N.W.2d 310, 314 (Ia. 1981).

 This is not a case where the jury, however well-informed on the terms of the bargain or well-instructed on the law, can be relied upon to assess the credibility of Dank's and Erickson's testimony. The state's conduct has rendered that evidence unweighable by a jury because the witnesses were no longer free agents, and there was no standard by which their veracity could have been tested or estimated. *Franklin,* 577 P.2d at 862, citing *Rex, supra* note 3. The state put Dank and Erickson in a position where the value of their testimony was incapable of appraisal. Initially, when told to testify fully and freely, they exculpated Nerison. Later, when warned that they would be prosecuted if their testimony was not what the state let them know it wanted, they incriminated him. The state's deal with Dank and Erickson has frustrated the jury's ability to determine their credibility as witnesses and the weight to be accorded to their testimony. On the facts of this case, the state crossed the line. Its bargain with Dank and Erickson was impermissible, and we are satisfied that no reasonable person could conclude otherwise.

*By the Court.*—Judgment reversed.