STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

John NERISON, Defendant-Appellant.

Supreme Court

*No. 85–0951-CR. Argued January 7, 1987.—Decided February 19, 1987.*

(Also reported in 401 N.W.2d 1.)

For the plaintiff-respondent-petitioner the cause was argued by *Daniel J. O'Brien*, assistant attorney

general, with whom on the briefs was *Bronson C. La Follette*, attorney general.

For the defendant-appellant there was a brief by *Janet A. Jenkins* and *Bosshard and Associates*, La Crosse, and oral argument by *Janet A. Jenkins*.

STEINMETZ, J.   The issue in this case is whether John Nerison, the defendant, was denied his right to a fair trial by virtue of inducements given by the state to his accomplices in exchange for their testimony implicating the defendant.

John Nerison (Nerison) is a wholesale cattle dealer in southwestern Wisconsin. In the years prior to Nerison's trial, several cattle thefts took place in southwestern Wisconsin. Eventually, Lyle Dank (Dank), Daniel Erickson (Erickson) and Fred Eich (Eich) were apprehended. Dank made a deal to testify against the other two men, pled guilty to the charges against him and received a reduced sentence. Erickson and Eich were tried, and Dank testified for the state at their trial. Both were found guilty. Two of these men, Dank and Erickson, later testified that Nerison helped them plan which cattle to steal and then purchased the stolen cattle after the theft and sold them through his dealership. This testimony was given at a John Doe hearing and at Nerison's trial in exchange for inducements by the state.

After a jury trial in circuit court for Vernon county, the Honorable Walter S. Block, John Nerison was convicted March 18, 1985, of being a party to the crime of burglary and theft of cattle, contrary to secs. 943.20(1)(a), (3)(a), 943.10(1)(a) and 939.05, Stats. Sentence was withheld on the burglary counts and the defendant was placed on probation for two years. He was ordered to pay restitution as a condition of

probation and was also ordered to pay $20,000 in fines on the theft counts.

The trial court held the traditional due process safeguards of full disclosure, cross-examination and instructions to the jury concerning the use of accomplice testimony were sufficient to insure the defendant's right to a fair trial.

The court of appeals held that the inducements given by the state to the accomplices denied the defendant his right to a fair trial and consequently reversed the judgment of conviction. *State v. Nerison*, 130 Wis. 2d 313, 387 N.W.2d 128 (Ct. App. 1986).

The court of appeals, while assuming that it is generally proper for the state to give inducements to accomplices in exchange for their testimony, found that the inducements in this case "crossed the line" of due process. That court concluded that the line of due process is crossed when the inducements have "frustrated the jury's ability to determine their [accomplices] credibility as witnesses and the weight to be accorded to their testimony," and where the deal is so "corrupt" that "no reasonable person could conclude otherwise." That court went on to conclude that the inducements given to witnesses Lyle Dank and Daniel Erickson frustrated the jury's ability to assess credibility such that no reasonable person could conclude they were other than "corrupt" bargains. *Id.* at 326.

In order to determine if the state "crossed the line" of due process, we will examine the details of both the testimony and the bargain. Dank was originally arrested for stealing cattle belonging to Clifford Chambers (Chambers). While in jail, he was approached by the sheriff who, on behalf of the district attorney, Russell Hanson, offered him a "deal." In exchange for disclosing the identities of any persons

who may have been involved in the Chambers' theft and other unsolved cattle thefts, Dank would be released on bond, the charges pending against him would be reduced, and the state would recommend probation rather than a prison sentence. In addition, District Attorney Hanson agreed that Dank would not be prosecuted for any crimes he might confess to during the interviews and that he would not be sentenced for the Chambers' theft until sometime later, when his testimony was no longer necessary to implicate other participants whom he might identify.

Dank agreed to cooperate and was questioned under oath by several officers. He stated that he and Erickson had stolen several cattle belonging to Roger Mueller (Mueller) and sold them to Nerison. He also implicated Erickson and a third man, Eich, in one or more other cattle thefts. On several occasions, officers specifically asked Dank whether Nerison had been involved in or had knowledge of any of the thefts. Dank stated that Nerison was not involved and did not know that he was purchasing stolen cattle.

On the basis of Dank's statements, Erickson and Eich were charged with theft. Dank testified at preliminary hearings in both cases, again stating under oath that Nerison was not involved in any of the thefts. At a third preliminary hearing on another charge against Erickson, Dank again testified that Nerison had no knowledge that the purchased cattle were stolen.

At Erickson's trial, he took the stand in his own defense and testified that he did not participate in any of the thefts. Dank testified for the prosecution, and Erickson was convicted and sentenced to seven years in prison. Eich was also convicted on the basis of Dank's testimony.

During this time, Dank, who had not yet been sentenced for the Chambers' theft and was still free on bond, was charged with other crimes—two counts of battery and one of attempted theft. As to the latter, Dank attempted to steal a bull and sell it under his name at Nerison's sale barn. Nerison recognized the animal as stolen, refused to pay Dank the money received for it and called the police. With the new charges pending against him, Dank approached Nerison to ask whether "he could talk to Russell Hanson (Hanson) (the district attorney) and see if he could let up a little bit." Dank threatened to implicate Nerison in the thefts if he could not get the district attorney to stop prosecuting him.[1]

Eventually, Dank was convicted for both the Chambers' theft and the later offenses. He received his original "deal" for the Chambers' theft, a withheld sentence and probation on the new charges of battery and attempted theft of the bull, and he was sentenced to one year in prison.

In February, 1984, Dank was approaching trial on an unrelated assualt charge which Vernon County District Attorney Hanson was prosecuting. Dank's attorney communicated to Hanson that "It is too bad that you are John Nerison's attorney because we have some good stuff we can tell you about John if you get

[1] Russell Hanson, the district attorney, also had a private law practice and had represented John Nerison on previous occasions. When it appeared that Dank might implicate Nerison, Hanson wrote a letter to the sheriff and his assistant district attorney outlining his conflict of interest and offering to appoint a special prosecutor if the need arose. However, since Dank did not implicate Nerison at the time Dank made his first "deal" or in the testimony arising from that "deal," Hanson saw no reason to appoint a special prosecutor.

out of this." Since this was the first time anyone had implicated Nerison in the cattle thefts, and since Hanson had previous dealings with the defendant in Hanson's private law practice, James J. Robb (Robb), the district attorney from Richland county, was named as special prosecutor to investigate and prosecute Nerison. This was done at Hanson's request.

After special prosecutor Robb entered the case, he approached Erickson after Erickson had been convicted in a Richland county trial of related cattle thefts and was charged with suborning perjury for enticing a defense witness to testify falsely. Robb made a deal with Erickson to testify against Nerison. Robb, armed with the statements Dank's attorney made to Hanson, also made a deal with Dank to testify against Nerison. Hanson was not involved in any of the deals to implicate Nerison and was called as a defense witness at Nerison's trial.

A John Doe investigation was convened at which both Erickson and Dank gave testimony implicating Nerison. During the hearings, the special prosecutor, Robb, outlined the "bargains" he had struck with Dank and Erickson in exchange for their testimony against Nerison at the John Doe hearing and at trial. Dank was promised: (1) that he would be granted immunity for any criminal activities he might testify to; and (2) that he would not be prosecuted for his part in a 1983 cattle theft in Rock county. Erickson received the following inducements: (1) the state's recommendation that his existing sentence be reduced by three years and that he be transferred to a minimum security prison and paroled early; (2) dismissal of the perjury charge; and (3) the state's promise not to prosecute him for his part in the 1983 Rock county theft. According to the special prosecutor

Robb, if Dank made "material misrepresentations" in his John Doe or trial testimony, the deal would be off.

Dank and Erickson were the state's chief witnesses against the defendant at trial. In exchange for his testimony implicating the defendant as a party to these offenses, Dank was given immunity from prosecution for perjury for his previous false testimony in the Erickson and Eich prosecutions in Richland county and immunity from prosecution for a cattle theft in Rock county. He would still be subject to a perjury prosecution if he made any material misrepresentation in his testimony at the defendant's trial, as well as a Rock county cattle theft prosecution.

In exchange for his testimony implicating the defendant as a party to these offenses, Erickson was granted immunity from perjury for prior false testimony as a defendant in his own case, which resulted in a guilty verdict for cattle theft in Richland county; he was granted immunity from prosecution in Richland county for attempting to obtain false alibi testimony from a witness in his own trial; he would not be prosecuted for a cattle theft in Rock county; the sentence he was then serving would be modified to concurrent rather than consecutive time; Robb agreed to contact prison officials in an attempt to have Erickson transferred out of Waupun. The special prosecutor also agreed to request authorities to consider Erickson for parole as soon as possible, but Erickson was still subject to perjury prosecution for any false testimony by him in the defendant's trial.

The record indicates that Dank and Erickson were not immunized from perjury that they might commit at the defendant's trial or at any time in the future as the court of appeals concluded. Rather, they

were immunized from prosecution for perjury that occurred prior to the defendant's trial.

As a result of Dank's and Erickson's testimony at the John Doe hearings, Nerison was charged with theft and burglary of the Mueller and Chambers' cattle. The theory of the prosecution was that Nerison had agreed with Dank and Erickson in advance to purchase any cattle they might steal. Both Dank and Erickson testified at Nerison's trial, and theirs was the only testimony specifically implicating Nerison in the "conspiracy." The terms of the state's agreements with each witness were made known to the jury, and the jury convicted Nerison on all four counts.

Nerison argues that his conviction should be reversed because the state's tactics in negotiating for Dank's and Erickson's testimony so tainted the evidence that he was deprived of a fair trial.

We disagree with the court of appeals conclusions that the bargains rendered the value of the witnesses' testimony "so indelibly and irreparably tainted" as to deny the defendant a fair trial. 130 Wis. 2d at 315. The bargains did not frustrate "the jury's ability to determine their credibility as witnesses and the weight to be accorded to their testimony." 130 Wis. 2d at 326. They were not "corrupt" deals and the state did not cross the line of due process requiring that the judgment of conviction be reversed.

Cross-examination, not exclusion, is the proper tool for challenging the weight and credibility of accomplice testimony. In *State v. Lenarchick*, 74 Wis. 2d 425, 446–48, 247 N.W.2d 80 (1976), we recognized the right of a defendant to cross-examine an accomplice about prosecutorial concessions in his favor in exchange for testimony implicating a defendant. *See*

*also Champlain v. State*, 53 Wis. 2d 751, 756–57, 193 N.W.2d 868 (1972); *State v. Schenk*, 53 Wis. 2d 327, 334–35, 193 N.W.2d 26 (1972); *State v. Gresens*, 40 Wis. 2d 179, 186, 161 N.W.2d 245 (1968). We held this rule is valid because cross-examination is the "greatest legal engine" ever invented for discovering the truth. *Lenarchick*, 74 Wis. 2d at 437.

When the state grants concessions in exchange for testimony by accomplices or co-conspirators implicating a defendant, the defendant's right to a fair trial is safeguarded by (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the state to testify against the defendant. *E.g., United States v. Fallon*, 776 F.2d 727 (7th Cir. 1985); *United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985). *See generally Hoffa v. United States*, 385 U.S. 293 (1966).

If the jury is informed as to arrangements for testimony with an accomplice or co-conspirator and proper instructions are given as to the value of such testimony, then such testimony may be presented and considered. In *Hoffa*, 385 U.S. at 311–12, the United States Supreme Court stated:

> "The petitioner is quite correct in the contention that [the informant], perhaps even more than most informers, may have had motives to lie. But it does not follow that his testimony was untrue, nor does it follow that his testimony was constitution-

ally inadmissible. The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury. At the trial of this case, [the informant] was subjected to rigorous cross-examination, and the extent and nature of his dealings with federal and state authorities were insistently explored. The trial judge instructed the jury, both specifically and generally, with regard to assessing [his] credibility. The Constitution does not require us to upset the jury's verdict."

In *United States v. Fallon*, 776 F.2d 727 (7th Cir. 1985), involving a mail fraud charge and conspiracy to alter motor vehicle odometers, the government gave a "performance deal" to an accomplice in exchange for his testimony against the defendant. The accomplice was to receive lenient treatment in the case contingent upon his "complete and truthful cooperation." The accomplice would face at most three charges, the bringing of which would be delayed until after the witness "had completed his cooperation" with the government. Further, at sentencing the government would recommend no incarceration "if the level of cooperation could materialize as represented." The agreement stated further that only after completion of his cooperation would the government "be in the best posture to evaluate the witness' efforts." Finally, the agreement concluded that the government might charge the witness with less than the three mentioned counts if "in the considered opinion of the responsible Assistant U.S. Attorney he, in his sole judgment, decided the level of cooperation so warranted." *Id.* at 733. In *Fallon* the court reasoned: "In our legal system, the danger of perjured or unreliable testimony

from immunized accomplices is minimized not by excluding that testimony but through the use of procedural safeguards." *Id.* at 734.

The district judge originally allowed the testimony of the accomplice to be introduced at trial. Afterward the judge concluded that the testimony should not have been admitted because of the "performance deal" and ordered the jury to disregard it. On appeal, the defendant argued that the district court did not go far enough and should have declared a mistrial after erroneously admitting this testimony.

In approving the reception of the accomplice testimony, the Seventh Circuit Court of Appeals relied primarily on the First Circuit Court of Appeals decision in *United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985). *Dailey* involved three accomplices with Dailey in a drug smuggling operation who were given complicated plea bargains in exchange for their testimony implicating Dailey. Lenient sentences were made contingent upon their "fully cooperat[ing]" with the government and upon the "value" of their testimony to the government. In *Dailey*, the First Circuit Court of Appeals stated:

> "Long ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded. *See, e.g., Benson v. United States*, 146 U.S. 325, 13 S. Ct. 60, 36 L. Ed. 991 (1892); *Rosen v. United States*, 245 U.S. 467, 38 S. Ct. 148, 62 L. Ed. 406 (1918). Recognizing that such individuals were frequently the most knowledgeable witnesses available, the courts have chosen to allow them to testify and to rely upon cross-examination to ferret out any false testimony they might give. As the Supreme Court put the matter in

48

*Hoffa v. United States*, 385 U.S. 293, 311, 87 S. Ct. 408, 418, 17 L. Ed. 2d 374 (1966), '[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.' In the particular case of an accomplice who has struck a plea agreement, the 'established safe-guards' are that the jury be informed of the exact nature of the agreement, that defense counsel be permitted to cross-examine the accomplice about the agreement, and that the jury be specifically instructed to weigh the accomplice's testimony with care. *See, e.g., United States v. Insana*, 423 F. 2d 1165, 1169 (2d Cir. 1970)." *Id.* at 196. *See also* cases cited in *Dailey* at 198–200.

In 1986 the Seventh Circuit Court of Appeals in *United States v. Peters*, 791 F.2d 1270 (7th Cir. 1986), applied again the reasoning of *Fallon*. In *Peters* accomplices received very favorable plea bargains requiring them to testify "truthfully" and that the offer was withdrawn if they "lied." The determination of truthful testimony or lying under oath would be determined by the government attorneys. The court concluded that these agreements did not create a risk of perjury so great as to render admission of this testimony a miscarriage of justice, or to render the testimony, unreliable as a matter of law. *Id.* at 1301.

In *United States v. Risken*, 788 F.2d 1361 (8th Cir. 1986), there was an implied understanding between the government witness and the FBI that the witness would receive a cash payment after trial contingent upon the quality of his testimony against the defendant. *Id.* at 1373. The court concluded that the fact that the cash payment to the witness was made contingent

upon conviction of the defendant did not in itself require reversal. *Id.* at 1374.

For other cases all consistent with *Fallon, Dailey* and *Peters, see United States v. Risken,* 788 F.2d 1361 (8th Cir. 1986), citing *Williamson v. United States,* 311 F.2d 441 (5th Cir. 1962); 464 U.S. 1073 (1984); *United States v. Spector,* 793 F.2d 932 (8th Cir. 1986); *United States v. Moody,* 778 F.2d 1380 (9th Cir. 1985); *United States v. Palow,* 777 F.2d 52 (1st Cir. 1985); *United States v. Barrett,* 766 F.2d 609 (1st Cir. 1985); *United States v. Valle-Ferrer,* 739 F.2d 545 (11th Cir. 1984); *United States v. Tapia,* 738 F.2d 18 (1st Cir.) *cert. denied,* 105 S. Ct. 217 (1984); *United States v. Kimble,* 719 F.2d 1253 (5th Cir. 1983), *cert. denied, United States v. McCallie,* 554 F.2d 770 (6th Cir. 1977); *Hawthorne v. United States,* 504 A.2d 580 (D.C. App. 1986); *State v. DeWitt,* 286 N.W.2d 379 (Iowa 1979); *Williams v. State,* 151 Ga. App. 683, 261 S.E.2d 430, 431 (1979); *State v. Lester,* 649 P.2d 346 (Hawaii 1982).

Language in *DeWitt,* 286 N.W.2d 379, bears quoting. In *DeWitt,* inconsistent statements were developed under oath from witnesses who struck plea bargains. The Iowa Supreme Court stated in upholding the jury hearing the background of accomplices' testimony:

> "Upon voir dire and cross-examination this defendant's counsel developed for the jury all the facts in the light most favorable to defendant. That the accomplices had spun several inconsistent prior versions of defendant's participation did not contaminate their testimony, but went to the weight, if any, to be given it." *DeWitt,* 286 N.W.2d at 385.

The court went on to conclude:

"We now hold that except where no reasonable person could avoid finding a corrupt bargain has been struck, the accomplice's testimony should be weighed by the jury following liberal cross-examination to expose all factors which might influence the witness." *Id.* at 386.

In the instant case the trial court admitted the testimony of Dank and Erickson which was then subject to the traditional due process safeguards of full disclosure of the terms of the plea agreements to the jury, aggressive cross-examination by defense counsel concerning the motives of Dank and Erickson to testify falsely against the defendant, and specific instructions cautioning the jury as to the weight and credibility to be given the testimony of Dank and Erickson.

All of the reasons for doubt of the credibility of Dank and Erickson were before the jury. The jury knew that both received favorable inducements from the state in exchange for their testimony against the defendant. Further, the jury knew that both men lied under oath in the past and, consequently, faced possible prosecution for perjury. It is clear that the jury knew Dank had previously denied under oath that the defendant was involved in the conspiracy and Erickson never affirmatively implicated the defendant in the conspiracy. Finally, the jury knew that both men have lengthy criminal records.

There is corroborating evidence in the state's case consistent with the defendant's guilt but the case is not before us on the issue of sufficiency of the evidence and therefore we will not recite it.

The instruction given by the trial court in protecting the defendant as to fair trial and due process was critical. It was:

51

"Dank and Erickson have testified on behalf of the State, and if their testimony is true, they participated in the crime charged against the defendant. Such a person is referred to as an accomplice.

"A verdict of guilty may be based upon this testimony providing it is of such a character, taken in connection with all the other evidence in the case, as to satisfy you of the guilt of the defendant beyond a reasonable doubt. But ordinarily, it is unsafe to convict upon the uncorroborated testimony of an accomplice. Therefore, you should examine such evidence with the utmost care and caution, scrutinize it closely, and weigh it in the light of all of the attending circumstances as shown by all of the evidence. You should not base a verdict of guilty upon it along [sic], unless after such scrutiny and consideration it satisfies you of the guilt of the defendant beyond a reasonable doubt.

"Evidence has been received to the effect that the witnesses Dank and Erickson have bad reputations for truth and veracity. You may consider such evidence in weighing that witness' testimony and determining their credibility.

"Evidence has been received to the effect that some of the witnesses in this trial have heretofore been convicted of crime. This evidence was received solely because it bears upon the credibility of a witness' testimony. The fact of conviction is one that you should take into consideration in weighing his testimony and determining his credibility. It must not be used for any other purpose.

"Their testimony should be examined by you with greater care than the testimony of an ordinary witness. You should consider whether their testimony may be affected by their own interest. After such consideration, you may give the testi-

52

mony of a witness granted immunity the weight you feel it deserves."

As the court stated in *Dailey,* 759 F.2d at 197–98:

"Thus, while the district court was correct in concluding that these agreements provide some inducement to lie or to embellish the facts, the question is whether that inducement is significantly greater in degree or more sinister in quality than the inducements created by agreements that have passed judicial muster in the past."

The court of appeals found the agreements with Dank and Erickson required them to testify to the state's version of the "truth," that they had to give testimony that would implicate the defendant and that the state "defined the truth in its own terms." *Nerison,* 130 Wis. 2d at 324–25. That, however, makes this case no different from any other involving negotiated plea agreements with accomplices in exchange for their testimony. Ultimately, it is for the jury as factfinder to weigh the testimony and evaluate credibility before making its ultimate determination in the form of its verdict as to what is the "truth." As in any case, the state is entitled to compose a theory of prosecution as to what it believes to be the truth. The defendant is equally entitled to place a contrary theory before the jury. The jury, not the prosecutor or the defendant, ultimately determines the "truth" based upon its observation of the witnesses, its evaluation of their credibility in light of cross-examination, complete disclosure to it concerning terms of plea agreements, and careful instructions by the court on the law concerning the weight and credibility to be given the testimony of witnesses in general and accomplices in particular.

■

We find the record disclosed that Dank and Erickson were granted immunity from prosecution for *past* perjury, not as the court of appeals found that "both Dank and Erickson were granted immunity from prosecution for perjury in connection with their testimony implicating Nerison in the cattle thefts." 130 Wis. 2d at 318. To give immunity for future perjury is unheard of, would be a due process violation, and could be subject to attorney discipline, but that was not what happened here as shown by this record.

Due process prevents a prosecutor from relying on testimony the district attorney knows to be false, or later learns to be false. *Giglio v. United States,* 405 U.S. 150, 153–54 (1972). Due process requires a new trial if the prosecutor in fact used false testimony which, in any reasonable likelihood, could have affected the judgment of the jury.

■

Due process requires the prosecutor to disclose all exculpatory evidence, including impeachment evidence relating to the credibility of witnesses for the prosecution. *United States v. Bagley,* 105 S. Ct. 3375, 3380–81 (1985); *Brady v. Maryland,* 373 U.S. 83 (1963).

The prosecutor may not rely upon evidence which is incredible as a matter of law, that evidence which conflicts with nature or with fully established or conceded facts. *See State v. Daniels,* 117 Wis. 2d 9, 17, 343 N.W.2d 411 (Ct. App. 1983). The testimony in this record was not incredible as a matter of law as demonstrated through corroboration by independent evidence.

The due process "line" referred to by the court of appeals was not crossed here due to corroborating

evidence of guilt, and the defendant was afforded the traditional due process safeguards of full disclosure, cross-examination and specific instruction to the jury concerning the testimony of Dank and Erickson.

Another issue raised by the defendant, but not commented on by the court of appeals, is the exclusion of evidence of other cattle thefts committed by Dank, Erickson and Eich in which the state knew the defendant did not participate. There was a defendant's motion *in limine* held prior to trial regarding this other crimes evidence. The trial court ruled prohibiting testimony regarding the theft of cattle and pigs from Sid Matthis's farm but did not specifically prohibit any other testimony about prior cattle thefts involving the accomplices at that time. The trial court held that the testimony about the Matthis's livestock theft "has no relevancy."

The only way defendant was offering this evidence of other crimes was through doubt as to the credibility of the accomplices' testimony. The most it would have done is shown the accomplices committed other crimes of a similar nature in which they did not claim the defendant participated. All that it would have done is portrayed Erickson, Dank and Eich as seamier characters than what they already admitted to being. They already admitted to perjury, conviction of other similar crimes and having in addition criminal records. This use of evidence of other crimes was never intended. The general rule against other crimes evidence is that it must not be used to prove the guilt of the defendant of the charged crime unless it fits the exceptions of motive, intent, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident. However, here the three individuals did not deny committing the other

offenses in which the defendant was not involved. The evidence was not offered to prove that the witnesses did something they denied doing, but only to further impeach their testimony involving the defendant in the charged crimes. It would have provided cumulative evidence at best. The ruling was within the discretion of the trial judge and he did not abuse it. In fact, the trial judge in denying defendant's motion as to the type of evidence stated that if the evidence came in in another manner as to the time of the charged offenses he would let it into evidence.

As we stated in *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983):

> "Upon review of evidentiary issues, '[t]he question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.' *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). Thus, the test is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised. *Id.* This court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination. *Boodry v. Byrne*, 22 Wis. 2d 585, 589, 126 N.W.2d 503 (1964). For a discretionary decision of this nature to be upheld, however, 'there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth.' *State v. Hutnik*, 39 Wis. 2d 754, 764, 159 N.W.2d 733 (1968)."

*By the Court.*—The decision of the court of appeals is reversed.