COURT OF APPEALS
DECISION
DATED AND FILED

December 22, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1513-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF3678

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TONY POWELL, JR.,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed.*

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Tony Powell, Jr., appeals a judgment, entered upon a jury's verdict, convicting him of first-degree reckless homicide by use of a dangerous weapon as a party to a crime.  He also appeals a postconviction order denying his motion for a judgment of acquittal or, alternatively, sentence modification.  Powell alleges that a State's witness "refused to disclose his true motivation for coming forward," and therefore the evidence at trial was insufficient to sustain a conviction.  He further alleges that his sixty-one-year sentence was unduly harsh.  We reject his claims and affirm.

## Background

¶2    According to the criminal complaint, Powell and two companions, Damonta Jennings and Otha Brown, fired a barrage of gunshots at a multi-family home in the 1500 block of West Meinecke Avenue, in Milwaukee, Wisconsin, on May 5, 2016.  A bullet struck and killed a nine-year-old girl, Z.J., who was in the living room of the home.  In August 2017, the State charged Powell, Jennings, and Brown with first-degree reckless homicide by use of a dangerous weapon as parties to a crime.

¶3    Powell's case proceeded to a jury trial in June 2018.  The State's evidence included a statement that Powell gave to police in which he admitted that on the night of May 5, 2016, he was a passenger in a white car that Jennings was driving.  Powell also admitted that they had stopped in front of a house at 15th and West Meinecke Avenue to sell a telephone when a woman came out of the house and began "yelling at them to move ... because she thought ... that they were selling drugs."  A man next emerged from the same house and began shooting at the car as the men drove off.  Powell claimed that Jennings then drove Powell to a

spot "about eight minutes away" and that Powell did not return to the area of 15th and West Meinecke Avenue that night.

¶4      In addition to Powell's statement, the State presented evidence from a woman who told the jury that she was on the porch of the home at 15th and West Meinecke on May 5, 2016, when she saw an interaction involving at least two gunmen in a white car and a person in another vehicle. She said she stopped watching and shut the door when she saw the guns, but she heard a burst of gunfire, a pause, and then a lot of shooting.

¶5      Another witness who lived near 15th and West Meinecke said he saw three men, each with a gun, get out of a white Chevrolet Malibu on the night of the shooting. The witness ran into his home and then heard approximately forty gunshots.

¶6      A Milwaukee police officer told the jury that on the evening of May 5, 2016, an acoustic sensor registered two separate incidents of gunfire in the area near the 1500 block of West Meinecke Avenue. The first incident involved approximately eighteen gunshots. The second incident occurred one minute and twenty-five seconds later and involved approximately thirty gunshots. Police who responded to the scene found bullet casings of multiple calibers, including 7.62 millimeter casings that are typically fired from a "larger rifle" such as an AK-47.

¶7      A detective described searching a white Chevrolet Malibu some months after the shooting and observing that the car had been damaged in a way that was consistent with bullet strikes. The car contained Jennings's state identification and a debit card issued to Powell. A second detective described finding a cellphone abandoned at a scene separate from the shooting. The

cellphone, which was associated with an email address that included Powell's first and last names, contained images of a person who appeared to be Powell holding an "AK-47-type ... assault rifle."

¶8 The State also presented testimony from Sterling Dunlap. He said that on May 5, 2016, he was on the porch of a home on North 15th Street, less than a block away from the scene of the shooting, when Jennings, Brown, and Powell drove up in a white Malibu. Dunlap described his relationship with the three men: he and Jennings were friends; Brown and Powell were related to Dunlap's girlfriend. The three men told Dunlap that a man "around the corner" had "just pulled a gun on them." Dunlap could see that Jennings, Brown, and Powell each had a gun on his lap, and Dunlap identified Powell's gun as an assault rifle. Dunlap testified that he told the three men to "get off of that .... [J]ust let it be." He said the men drove away and then he heard many gunshots.

¶9 Dunlap said he spoke to Powell again the next day. Powell told Dunlap that a "dude just started firin[g] shots at the car. So ... they parked and hopped out and started firin[g] back ... at the building."

¶10 Dunlap admitted that he was presently in custody and that he had not disclosed what he knew about the shooting until he was arrested for an unrelated matter in October 2016. He denied, however, that he had received anything from the State in exchange for his testimony. He said that he spoke to the police because he knew that the victim's "family needed closure" and that he was testifying because he was pained by the loss of an "innocent life." He said that he first spoke to the prosecutor that morning.

¶11 After a recess, the lawyers advised the circuit court that the prosecutor had conducted a further inquiry into the circumstances of Dunlap's

disclosure of information to law enforcement. Specifically, the prosecutor had learned that Dunlap was arrested in October of 2016, while he was serving a term of extended supervision for a felony conviction, and that he had revealed to the detectives who interviewed him following his arrest that he had information about Z.J.'s homicide. The detectives subsequently asked an assistant district attorney, Laura Crivello, not to charge Dunlap with a new crime because he had provided valuable information that permitted them to solve a homicide. On November 8, 2016, Crivello made the decision not to issue any charge against Dunlap.

¶12 The parties and the circuit court agreed that Powell should have the opportunity to cross-examine Dunlap about the information that had just come to light, and he was recalled to the stand. Dunlap then testified that he was arrested in October 2016 for possessing a firearm while a felon and that following his arrest he admitted to police that he had "touched a gun." He told the jury that he had taken the gun away from a child to prevent "something [from happening] with the gun," but he acknowledged that as a convicted felon he could not lawfully handle a firearm.[1] Dunlap further acknowledged that only after detectives questioned him about his handling a gun did he give them information about Z.J.'s homicide. According to Dunlap, the detectives subsequently told him that they would "talk to the D.A." about the information he had provided but would make "no guarantee."

¶13 Dunlap conceded that the State did not charge him with a new crime following his October 2016 arrest and that the State made its decision not to

---

[1] Pursuant to WIS. STAT. § 941.29 (1m)(a) (2015-16), a person who possesses a firearm is guilty of a felony if the person has previously been convicted of a felony in Wisconsin. All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

charge him after receiving his information about the homicide. He insisted, however, that the information he provided about Z.J.'s homicide had no impact on the State's decision not to charge him with a new crime. When defense counsel pressed him to say whether he had received any consideration for the information he gave to police, Dunlap responded: "the only thing the officer told me [was that] he [would] talk to the D.A. That's it. He talked to the D.A." Dunlap further testified: "he said there's no promise. There's no guarantee, nothing. There's no promise." Defense counsel then asked Dunlap why the absence of any charge in connection with his October 2016 arrest did not constitute a benefit. Dunlap responded that he was not charged because he was not in possession of a gun when the police arrested him.

¶14    Dunlap went on to testify that at the time of his October 2016 arrest, he was serving a term of extended supervision for an earlier crime and that the rules of his supervision prohibited handling a firearm. He said that his extended supervision was revoked as a consequence of his rule violation, and he was therefore required to serve an additional two years of confinement for his earlier crime.

¶15    After the State rested its case, Powell presented testimony from Crivello about her actions in regard to the October 2016 allegations against Dunlap. She said that the detectives who spoke to her about Dunlap in 2016 asked her to delay consideration of any charges against him and then asked her not to charge him in light of the useful information that he provided about Z.J.'s homicide. She explained that the decision to issue charges against a person requires consideration of multiple factors including the facts of the case, the person's criminal history, and all of the known relevant information tending to show "whether it's just and fair to move forward with the prosecution." She said

6

that the potential charge against Dunlap was possessing a firearm as a felon and that the statutory penalty included ten years of imprisonment. She told the jury that, in her view, the facts were strong enough to support charging Dunlap but that, in light of all of the factors—including the time in prison that Dunlap faced upon revocation of his extended supervision, her conversations with Dunlap's probation officer, and the information Dunlap provided to law enforcement about Z.J.'s homicide—she decided against charging Dunlap with a crime.

¶16    The jury found Powell guilty as charged. The circuit court imposed a sixty-one-year term of imprisonment bifurcated as forty-one years of initial confinement and twenty years of extended supervision.

¶17    Powell moved for postconviction relief, raising two issues. First, he sought a judgment of acquittal on the ground that the evidence was insufficient to sustain his conviction. In this regard, Powell argued that Dunlap: (1) "refused to admit" that the reason he gave information to the police was "because he knew that it would have an effect on his [gun] possession case"; (2) "refused to admit that he had even committed a crime"; and (3) "never even mentioned that the A[dministrative] L[aw] J[udge] had found him guilty of that crime [in the revocation proceedings] and that [was] the reason he [was] revoked." With the motion, Powell submitted the administrative law judge's written decision revoking Dunlap's extended supervision. The decision reflected that Dunlap stipulated in the revocation proceedings that he had possessed a firearm in violation of his rules of supervision and, based on the stipulation and the evidence, the administrative law judge "f[oun]d that he engaged in the conduct and violated the rules of supervision." Powell asserted that the material from the revocation proceedings showed that Dunlap's "situation was ... different" from the way Dunlap portrayed it in his testimony because the material reflected the administrative law judge's

7

determination that Dunlap "was in fact guilty." According to Powell, the evidence showed that "the only reason Dunlap [came] forward [with information about the homicide] was because he knew he was going to get some consideration for his information and for his testimony at [Powell's] trial." Powell concluded that, in light of Dunlap's alleged omissions, Dunlap's testimony was "totally untrustworthy," and the evidence presented at trial was thus insufficient to sustain the conviction.

¶18 As a second ground for postconviction relief, Powell sought sentence modification on the ground that his sentence was unduly harsh. In support, Powell showed that the circuit court sentenced his co-defendant, Jennings, to serve thirty-five years of initial confinement—six years fewer than Powell received—and twenty years of extended supervision. Powell alleged that he and Jennings were similarly situated but the circuit court sentenced Powell more harshly for an improper reason, namely, that he went to trial while Jennings pled guilty.

¶19 The circuit court rejected Powell's claims without a hearing. As to the request for a judgment of acquittal, the circuit court ruled that Dunlap's alleged lack of credibility did not render the evidence insufficient. As to the request for sentence modification, the circuit court ruled that Powell and Jennings were not similarly situated given the differences in their ages and criminal records, and in light of Powell's failure to accept responsibility for his actions. Powell appeals.

## Discussion

¶20 Citing *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990), Powell argues that the evidence at trial was insufficient to support his conviction. He is wrong.

¶21     When this court considers a challenge to the sufficiency of the evidence, our inquiry is whether "the evidence, viewed most favorably to the [S]tate and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See id.* at 501.  Before the jury could find Powell guilty, as a party to a crime, of first-degree reckless homicide by use of a dangerous weapon, the State was required to prove beyond a reasonable doubt that he either directly committed the crime or that he intentionally aided and abetted the person who directly committed it.   *See* WIS. STAT. § 939.05; WIS JI—CRIMINAL 400.  The elements of the crime that the State was required to prove beyond a reasonable doubt were:  (1) Powell, or a person that he aided and abetted, caused the death of Z.J.; (2) Powell, or a person that he aided and abetted, caused the death by criminally reckless conduct; (3) the circumstances of the conduct showed utter disregard for human life; and (4) Powell, or a person that he aided and abetted, committed the crime while using a dangerous weapon.  *See* WIS. STAT. §§ 940.02(1), 939.63; WIS JI—CRIMINAL 1020, 990.  The evidence presented here, which we have already summarized, overwhelmingly satisfied those elements.

¶22     Powell asserts, however, that the jury was not given sufficient evidence to determine Dunlap's credibility.  Specifically, he argues:

> There was nothing in either Dunlap's or [Crivello's] testimony that [gave] the jury the information it needed to know about the fact that Dunlap had been found guilty, by virtue of his own stipulation to that fact, of possessing a firearm by a felon, and that he knew, for a fact, that if he did not cooperate with the police and testify at the trial, he would be subject to prosecution for that crime.
>
>         ....

> [S]ince Dunlap's testimony [was] vital to directly linking [Powell] to this crime, and since the jury had not been given the essential information it needed to establish that Dunlap was lying when he testified that he had not committed the crime of possession of a [firearm] by a felon, and therefore, had not received any consideration by the [S]tate for his cooperation in this case when he was not charged with that crime, the evidence against [Powell was] insufficient in probative value and force to have allowed the jury to find him guilty beyond a reasonable doubt."

Powell misstates the facts and misunderstands the law.

¶23    First, contrary to Powell's assertion, Dunlap was not "found guilty" of any crime during the revocation proceedings. "The revocation decision is not a criminal adjudication." *State v. Spanbauer*, 108 Wis. 2d 548, 551, 322 N.W.2d 511 (Ct. App. 1982). The purpose of a revocation hearing is not to determine guilt or innocence, but to determine whether a person under supervision must be returned to a closed society or whether the person can be rehabilitated outside of prison. *See id.* at 551-52. Here, Dunlap stipulated in his revocation hearing that he possessed a firearm—a violation of his rules of supervision—not that he committed a crime. Indeed, the record shows that Dunlap argued during his revocation hearing, as he did at Powell's trial, that his conduct was benign, even praiseworthy, because he acted to protect a child. *Cf. State v. Coleman*, 206 Wis. 2d 199, 210-11, 556 N.W.2d 701 (1996) (recognizing that in some circumstances a defense of privilege exists to the charge of possessing a firearm while a felon). The administrative law judge who presided at the hearing concluded, however, that Dunlap had violated his rules of supervision and that "alternatives to revocation were inappropriate."

¶24    Second, and again contrary to Powell's assertion, Dunlap admitted at Powell's trial that he possessed a firearm while a felon. Dunlap testified that in October 2016: (1) he was a convicted felon; (2) he was arrested for possessing a

firearm as a felon; (3) he had handled a firearm; and (4) he knew that doing so was illegal.

¶25    Third, nothing in the record substantiates Powell's statement that Dunlap "knew, for a fact, that if he did not cooperate with the police and testify at the trial, he would be subject to prosecution for th[e] crime [of possessing a firearm as a felon]." Neither the testimony nor the postconviction submissions includes any evidence of such knowledge.

¶26    Powell evidently believes that Dunlap testified as he did because he thought that the State might prosecute him unless he provided information that assisted Powell's prosecution. The circuit court ensured that Powell had the opportunity to develop that theory at trial through cross-examination. *See State v. Lenarchick*, 74 Wis. 2d 425, 447-48, 247 N.W.2d 80 (1976). Powell's trial counsel capitalized on that opportunity by thoroughly cross-examining Dunlap, emphasizing that he admitted engaging in criminal conduct and that only after his arrest did he give information to detectives that incriminated Powell in a homicide. Powell's trial counsel further cross-examined Dunlap about assurances he received from the detectives that they would speak to the assistant district attorney on his behalf and the reasons that Dunlap never faced a criminal charge for his own crime. Dunlap insisted, however, that he offered his testimony out of concern for a child's lost life, and he denied that he received any benefit from the State for testifying as he did. Powell apparently does not believe Dunlap's responses, but that skepticism does not implicate any concerns about the sufficiency of the evidence. "[W]hen the question of the sufficiency of evidence is presented on appeal in a criminal case, 'the only question for this court is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendants' guilt beyond a reasonable doubt.'" *State v. White*, 68 Wis. 2d

11

628, 636, 229 N.W.2d 676 (1975) (citations and some punctuation omitted). In sum, as the circuit court correctly observed, Powell's "premise that Dunlap was untrustworthy, thus he was incredible, and thus there was insufficient evidence to convict [Powell] does not have a basis in the law."

¶27    As did the State, we have construed Powell's contentions on appeal as including an argument that the State violated Powell's right to due process by failing to disclose the inducements that Dunlap allegedly received for his testimony. That argument, as construed, also fails.

¶28    The State may properly offer concessions to a witness in exchange for testimony, subject to "traditional due process safeguards." *See State v. Nerison*, 136 Wis. 2d 37, 51, 401 N.W.2d 1 (1987). Specifically:

> When the [S]tate grants concessions in exchange for testimony by accomplices or co-conspirators implicating a defendant, the defendant's right to a fair trial is safeguarded by (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the [S]tate to testify against the defendant.

*Id.* at 46.

¶29    Powell cites *Nerison*, but the safeguards it requires are not applicable here. As this court explained in *State v. Miller*, 231 Wis.2d 447, 605 N.W.2d 567 (Ct. App.1999), *Nerison* applies only "where the witness agrees with the State 'to testify against the defendant.'" *See Miller*, 231 Wis. 2d at 465 (citation and emphasis omitted). Powell, however, does not demonstrate the existence of an agreement between the State and Dunlap for his testimony.

¶30    Moreover, were we to conclude that *Nerison* is applicable, we would conclude that Powell received its benefits. The jury heard testimony from Dunlap that the detectives who interviewed him promised that they were "going to talk to the DA. That's it. [They] talked to the DA." The jury also heard testimony from Crivello, who explained her charging decision. That satisfied the first prong of *Nerison*. *See id.*, 136 Wis. 2d at 46. Powell had the opportunity to cross-examine Dunlap and to probe Crivello's decision not to prosecute him. That satisfied the second prong of *Nerison*. *See id.* The circuit court gave the jury a cautionary instruction in regard to Dunlap and set forth the factors that the jurors should consider when assessing his testimony.[2] That satisfied the third and final prong of *Nerison*. *See id.*

¶31    Powell nonetheless argues that the *Nerison* safeguards failed because: (1) when Dunlap testified, he "refused to link anything that [Crivello] did about not charging him with [a] crime to the fact that he had agreed to testify in [Powell's] case" and therefore "there was no disclosure of the terms of any agreement struck with Dunlap"; and (2) "defense counsel had no knowledge that Dunlap had stipulated to his guilt ... at his revocation hearing, [so] defense counsel did not have the opportunity to fully cross-examine him about the effects of the

---

[2] As Powell acknowledges in his appellate brief, the circuit court instructed the jury:

> You have heard testimony from Sterling Dunlap, who may have received consideration in the form of not being charged with a crime for which he was arrested. This witness, like any other witness, may be prosecuted for testifying falsely. You should consider whether receiving this consideration affected the testimony and give the testimony the weight you believe it is entitled to receive.

13

consideration." As we have explained, however, *Nerison* does not apply. Moreover, the arguments fail on their merits.

¶32 Turning first to the claim that Dunlap "refused to link" Crivello's charging decision to an alleged agreement for him to testify, we remind Powell that, while *Nerison* affords a defendant the opportunity to cross-examine witnesses about inducements that the witnesses may have received, nothing in *Nerison* ensures that the witnesses will give the answers that the defendant hopes to elicit. "The Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination ... not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Nelis*, 2007 WI 58, ¶43, 300 Wis. 2d 415, 733 N.W.2d 619 (citation omitted; ellipsis in original). Indeed, "[t]he Confrontation Clause does not guarantee that a witness's testimony will not be 'marred by forgetfulness, confusion, or evasion.'" *State v. Rockette*, 2006 WI App 103, ¶22, 294 Wis. 2d 611, 718 N.W.2d 269 (citation omitted).

¶33 As to the claim that defense counsel was not advised about Dunlap's "stipulat[ion] to his guilt," we reiterate that no such stipulation exists. Dunlap stipulated in the revocation proceedings that he handled a firearm, not that he was guilty of a crime. At Powell's trial, Dunlap similarly admitted that he had handled a firearm, and Powell had the opportunity that *Nerison* affords to cross-examine Dunlap about his admission and the effect, if any, that his confessed behavior had

on his decision to testify as he did at Powell's trial. Accordingly, we conclude that Dunlap's testimony did not violate Powell's due process rights.[3]

¶34 We turn to Powell's challenge to his sentence. According to Powell, his sixty-one-year term of imprisonment was "unduly harsh and severe, especially in light of the fifty-five-year sentence that [Jennings] ... received." We are not persuaded.

¶35 Sentencing lies within the circuit court's discretion. *See State v. Gallion*, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. "When the exercise of discretion has been demonstrated, we follow a consistent and strong policy against interference with the discretion of the [circuit] court in passing sentence." *State v. Stenzel*, 2004 WI App 181, ¶7, 276 Wis. 2d 224, 688 N.W.2d 20. We defer to the circuit court's "great advantage in considering the relevant factors and the demeanor of the defendant." *See State v. Echols*, 175 Wis. 2d 653, 682, 499 N.W.2d 631 (1993).

¶36 The circuit court must consider the primary sentencing factors of "the gravity of the offense, the character of the defendant, and the need to protect the public." *State v. Ziegler*, 2006 WI App 49, ¶23, 289 Wis. 2d 594, 712 N.W.2d 76. The circuit court may also consider a wide range of additional factors related to the defendant, the offense, and the community. *See id.* The circuit court has discretion to determine both the factors that it believes are relevant in imposing

---

[3] The State's brief includes an argument that, if Powell suffered a violation of his due process rights, then the error was harmless. Because we conclude that Powell fails to demonstrate any error, we do not address this argument. *See State v. St. Germaine*, 2007 WI App 214, ¶24 n.5, 305 Wis. 2d 511, 740 N.W.2d 148.

sentence and the weight to assign to each relevant factor. *See Stenzel*, 276 Wis. 2d 224, ¶16.

¶37    A circuit court may modify its sentence if the circuit court concludes that it erroneously exercised its discretion by imposing an unduly harsh or excessive sentence. *See State v. Klubertanz*, 2006 WI App 71, ¶32, 291 Wis. 2d 751, 713 N.W.2d 116. However, "[a] sentence is unduly harsh or unconscionable 'only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.'" *State v. Cummings*, 2014 WI 88, ¶72, 357 Wis. 2d 1, 850 N.W.2d 915 (citation omitted).

¶38    A postconviction motion challenging a sentence affords the circuit court an opportunity to further explain the sentencing rationale. *See State v. Fuerst*, 181 Wis. 2d 903, 915, 512 N.W.2d 243 (Ct. App. 1994). If the defendant thereafter pursues an appeal, the reviewing court will search the record for reasons to sustain the circuit court's exercise of sentencing discretion. *See McCleary v. State*, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971).

¶39    Our review here reveals that the circuit court at sentencing considered the mandatory sentencing factors and thoroughly explained the basis for the sentence imposed. The circuit court discussed the gravity of the offense, describing the homicide of a child as "appalling." In addressing Powell's character, the circuit court began by noting that he was twenty-three years old at the time of the homicide, and the circuit court observed that, while "people in their teens don't measure risk well, ... twenty-three years, nine months and three days old is more than old enough to entirely understand that if you shoot a military style

16

rifle into a house where there are people that someone could die." The circuit court next considered that Powell had a prior conviction for cocaine trafficking and observed that he did not present any evidence that he had any "drug use problems." The circuit court found that the absence of such problems gave rise to an inference that Powell sold drugs for "purely economic motivation" and thus was "willing to profit from the destruction that [he knew] comes to people through the use of ... cocaine." Turning to the safety of the public, the circuit court discussed the community's strong interest in avoiding random shootings and the concomitant need to ensure that "[p]eople ... understand that when you shoot a gun into a house and someone dies[,] that there is an extremely serious consequence."

¶40 The circuit court went on to say that it had already sentenced Jennings, and the circuit court compared his circumstances with Powell's. In this regard, the circuit court emphasized that Jennings was younger than Powell and that Jennings accepted some responsibility for the victim's death. By contrast, Powell did not voice "any level of responsibility," which the circuit court viewed as "an important distinction between [Powell] and [] Jennings." In sum, the record shows that the circuit court considered a host of appropriate factors and that the sixty-one-year term of imprisonment imposed on Powell constituted a reasonable exercise of discretion.

¶41 Powell contends, however, that he and Jennings were similarly situated and therefore should have received the same sentences. The equal protection clauses of the federal and state constitutions require that persons similarly situated be accorded similar treatment. *See **Treiber v. Knoll***, 135 Wis. 2d 58, 68, 398 N.W.2d 756 (1987). Whether undisputed facts establish a constitutional violation is a question of law that we review *de novo*. **State v. Cobbs**, 221 Wis. 2d 101, 105, 584 N.W.2d 709 (Ct. App. 1998).

17

¶42   "[M]ere disparity in sentencing does not constitute a denial of equal protection of the law." ***Ocanas v. State***, 70 Wis. 2d 179, 186, 233 N.W.2d 457 (1975). To prevail on a claimed violation of equal protection at sentencing, the defendant must show that "the disparity was arbitrary or based upon considerations not pertinent to proper sentencing discretion." ***Id.*** at 187. Moreover, "leniency in one case does not transform a reasonable punishment in another case into a cruel one." ***State v. Perez***, 170 Wis. 2d 130, 144, 487 N.W.2d 630 (Ct. App. 1992).

¶43   On appeal, Powell argues that disparate sentencing in this case was unreasonable because the circuit court distinguished Powell from Jennings based on Powell's failure to accept responsibility for the homicide. Citing ***Drinkwater v. State***, 73 Wis. 2d 674, 678, 245 N.W.2d 664 (1976), Powell argues that the circuit court erred because "a defendant may not receive a harsher sentence solely because he availed himself of the constitutional right to a jury trial." *See id.* Powell's reliance on ***Drinkwater***, however, is misplaced. As that case explains, a sentencing court is not required to impose identical sentences on accomplices to a crime so long as the disparity is based upon factors relevant to sentencing. *See id.* at 679-80.

¶44   Here, the circuit court found that Jennings "stood up and [took] responsibility at least at some levels for [his] own conduct." Powell, by contrast, told the circuit court at sentencing that he had been wrongly convicted for a crime that he did not commit. The circuit court concluded that Jennings's willingness to accept responsibility for his crime was an important difference between Jennings and Powell. That conclusion was entirely proper. *See id.* at 682 (recognizing that a defendant's readiness to accept responsibility is a relevant sentencing consideration).

¶45     The circuit court also emphasized that Jennings was only nineteen years old at the time of the homicide and the youngest of the men involved in the crime. Powell, on the other hand, was nearly twenty-four years old. While Powell disputes the significance of the age difference between himself and Jennings, the weight to assign to a defendant's age rests in the circuit court's discretion. *See State v. Davis*, 2005 WI App 98, ¶18, 281 Wis. 2d 118, 698 N.W.2d 823.

¶46     Moreover, the circuit court found when sentencing Jennings that he did not have a prior criminal conviction and told him that "the only thing that is saving you from a maximum sentence here is the fact that you have no prior record." Powell, however, had a prior conviction for cocaine trafficking that deeply concerned the circuit court, not only because the crime demonstrated a callous character but also because Powell "had not benefited from previous amounts of probation." The circuit court's remarks at the two sentencing proceedings thus reflected a consistent sentencing rationale: prior criminal history warranted increasing the severity of the sentence for a defendant who, under the circumstances here, committed first-degree reckless homicide of a child. Criminal history is a proper factor to consider at sentencing. *See Drinkwater*, 73 Wis. 2d at 680-81. Jennings did not have such a history; Powell did. [4]

---

[4] During Powell's sentencing, the circuit court stated that Jennings had a prior criminal conviction for heroin trafficking. The record shows, however, that the circuit court specifically found when sentencing Jennings that he did not have a prior criminal record. In postconviction proceedings here, the State confirmed that Jennings did not have a prior record at the time he was sentenced for his role in Z.J.'s homicide. Thus, while the circuit court may have mischaracterized Jennings's criminal history when sentencing Powell, the circuit court's sentencing remarks reveal steady consistency: a prior criminal record was, in the circuit court's view, a significant factor in determining the severity of the sentence for the homicide at issue here.

¶47     In sum, the record shows that the circuit court properly exercised its discretion when it sentenced Powell.  The sentence imposed was modestly harsher than the sentence imposed on Jennings, but the two men were not similarly situated and the distinction was reasonable.  We affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).